Russell D. Paul (NJ Bar. No. 037411989)
Amey J. Park (NJ Bar. No. 070422014)
Abigail J. Gertner (NJ Bar. No. 019632003)
Natalie Lesser (NJ Bar No. 017882010)
**BERGER MONTAGUE PC**
1818 Market Street
Suite 3600
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net
nlesser@bm.net

| | |
|---|---|
| HERNAN A. GONZALEZ, individually, and on behalf of a class of similarly situated individuals,<br><br>        Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, d/b/a AUDI OF AMERICA, INC., AUDI AG, a German corporation, and VOLKSWAGEN AG, a German corporation,<br><br>        Defendants. | Superior Court of New Jersey Law Division, Mercer County<br><br>Docket No.:<br>Civil Action<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# INTRODUCTION

1.      Plaintiff Hernan A. Gonzalez ("Plaintiff") brings this action individually and on behalf of all similarly situated persons ("Class Members") in the New Jersey who purchased or leased any 2012-2017 Audi vehicle equipped with 2.0-liter turbocharged engines ("Class Vehicles")[1] against Volkswagen Group of America, Inc., ("VWGoA") d/b/a Audi of America, Inc., Audi AG, and Volkswagen AG ("VWAG") (collectively "VW" or "Defendants"). The allegations herein are based on personal knowledge as to Plaintiff's own experience and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.      This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.      Defendants VWAG, Audi AG, or both, designed and manufactured the Class Vehicles, and Defendant VWGoA imported, distributed, marketed, and sold the Class Vehicles through its extensive network of authorized dealerships in the United States. Defendant VWGoA also provides service and maintenance for the Class Vehicles dealers and service providers nationwide, using information

---

[1] The Class Vehicles are any 2012 through 2017 model year Audi vehicles equipped with a 2.0-liter turbocharged engine. These vehicles include the following Audi models: TT, A3, A4, A5, A6, Q3, and Q5.

provided by VWAG, Audi AG, or both.

4.     Defendants sold, directly or indirectly, through their agent dealers and other retail outlets, the Class Vehicles throughout New Jersey, without disclosing that the Class Vehicles' were equipped with defective turbocharged 2.0-liter engines ("2.0T Engine").

5.     VW's history of trouble with the 2.0T Engine is extensive, with the subject engine being the genesis for other class action lawsuits for excessive oil consumption in its 2009-2011 model year vehicles, and for the defective timing chain design for its 2008-2013 and its 2012-2019 model year vehicles.[2] These actions ultimately led VW to extend its warranty periods and reimburse claimants for unforeseeable costs related to the defective designs within the 2.0T Engines.

6.     VW wrongfully and intentionally concealed a defect in the design, manufacture, and/or workmanship of the piston rings and/or pistons/piston heads such that the piston rings do not seat properly in the grooves of the piston head ("Piston Defect") in the 2.0T Engine. The Piston Defect can cause the pistons and the engine itself to fail at any time. It can also cause the engine to consume an excessive amount of oil, because the combustion chamber is not properly sealed off from the parts of the engine which require engine oil for lubrication.  The

---

[2] *See* Asghari v. Volkswagen, 42 F.Supp.3d 1306 (C.D. California, 2013); *see also* In Re Volkswagen Timing Chain Product Liability Litigation, 2017 WL 1902160 (D.N.J. May 8, 2017); Opheim v. Volkswagen Aktiengesellschaft, 2021 WL 2621689 (D.N.J. June 25, 2021).

Piston Defect also results in the shrapnel of the fragments of the piston rings and/or minute pieces of the piston head circulating throughout the engine, damaging other engine components. For example, cylinder scoring is a frequent result of the Piston Defect. As a result of the Piston Defect, Plaintiff and Class Members incur out of pocket costs to repair or replace the damaged engine parts or their entire engine. A replacement of the piston rings and/or pistons costs thousands of dollars, and the cost for replacing a 2.0T Engine is well over $10,000.

7.     The Piston Defect in the 2.0T Engine also presents a safety risk for Plaintiff and Class Members, because when a piston or pistons suddenly and unexpectedly fails, the Class Vehicles immediately lose engine power. It goes without saying that a sudden loss of power poses a clear-cut safety risk—it can prevent the driver from accelerating, maintaining speed, and even adequately controlling the steering wheel, engaging the brakes, all of which drastically increase the risk of collisions.

8.     The Piston Defect also causes substantial damage. When the defect manifests, in addition to destroying critical engine components, it causes further damage throughout the powertrain of the Class Vehicles as shards of the pistons are circulating throughout the engine and fuel system.

9.     By way of explanation, in internal combustion engines, the piston is a fast-moving metal component contained within a cylinder. Piston rings attached at

4

the piston head make the piston gas tight. A piston's purpose is to transfer force from expanding gas in the cylinder to the crankshaft via a piston rod and/or connecting rod. In most, if not all, mass produced car engines, the intake, compression, combustion and exhaust process take place above the piston in the cylinder head, which forces the piston to move up and down within the cylinder, thereby causing the crankshaft to turn. The piston is subjected to tremendous forces and heat during normal engine operation.

10.     Specifically, the pistons and or piston heads in the Class Vehicles' 2.0T Engine are defective in that they cause excessive oil consumption and crack, fracture, or splinter at their point of contact. The damage to the pistons causes immediate loss of compression within the engine cylinder and causes the remnants of the piston to circulate throughout the fuel system of the Class Vehicles. These failures occur before the engine reaches 75,000 miles, resulting in a lifespan well short of the class members' expectations and the industry standard for similar engines.

11.     The Piston Defect is inherent in each Class Vehicle and was present at the time of sale.

12.     VW undertook affirmative measures to conceal the Piston Defect through, among other things, a Technical Service Bulletin ("TSB") that VWGoA issued to its authorized repair facilities (but not to the class members themselves).

13.     VW was sufficiently aware of the Piston Defect from pre-production testing, design failure mode analysis, aggregate purchases of replacement piston rings, pistons, and engines, calls to its customer service hotline, and customer complaints made directly to its agent dealers. However, this knowledge and information was exclusively in the possession of VW and its network of dealers who are Defendants' agents for repairs and, therefore, unavailable to consumers.

14.     The Piston Defect is material because it poses a serious safety concern. As attested by Class Members in scores of complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Piston Defect can impair any driver's ability to control his or her vehicle and greatly increase the risk of collision.

15.     The Piston Defect is also material because consumers incur significant and unexpected repair costs. VW's failure to disclose, at the time of purchase, the pistons' marked tendency to fail is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace essential engine components expected to last much longer than 75,000 miles of use.

16.     Had VW disclosed the Piston Defect, Plaintiff and Class Members would not have purchased the Class Vehicles or would have paid less for them.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction of this action. This Court

has personal jurisdiction over Defendant VWGoA because it is a New Jersey corporation whose registered agent for service is Corporation Service Company located at Princeton South Corporate Center, Suite 160, 100 Charles Ewing Boulevard, Ewing, Mercer County, New Jersey.  Defendant VWGoA also controls business operations and/or does extensive business with others in New Jersey and in Mercer County.

18.     Venue lies properly in this County pursuant to Rule 4:3-2(a)(3) because Defendant VWGoA can be served via its registered agent for service in Mercer County.

## THE PARTIES

**Plaintiff Hernan Gonzalez**

19.     Plaintiff Gonzalez is a New Jersey citizen who is domiciled in Bergenfield, New Jersey.

20.     On or around November 15, 2014, Plaintiff Gonzalez purchased a new 2015 Q5 from Audi Englewood, an Audi authorized dealership, located in Englewood, New Jersey.

21.     Plaintiff Gonzalez purchased his vehicle primarily for personal, family, or household use.

22.     Passenger safety and reliability were important factors in Plaintiff Gonzalez's decision to purchase his vehicle. Before making his purchase, Plaintiff

Gonzalez did an online search for the vehicle on Google. He visited Audi's website, as well as the dealership's website, to research the 2015 Audi and its 2.0T engines.  Moreover, before making his purchasing decision, Plaintiff Gonzalez test drove the vehicle he ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Gonzalez reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Gonzalez believed that his 2015 Audi would be a safe and reliable vehicle.

23.     VW's omissions were material to Plaintiff Gonzalez. Had VW disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Gonzalez would have seen and been aware of the disclosures. Furthermore, had he known of the Piston Defect, Plaintiff Gonzalez would not have purchased his vehicle, or would have paid less for it.

24.     In or around March 2021, with approximately 26,000 miles on the odometer, Plaintiff noticed his vehicle was excessively consuming oil and losing power while driving.  On or about May 20, 2021, the check engine light illuminated in Plaintiff's vehicle and Plaintiff brought his vehicle to Audi Englewood.  The dealership diagnosed the issue as piston failure and

recommended replacement of four pistons. Specifically, the dealership found faults for misfires in two cylinders, number 2 and 4, and found the same faults remained after swapping the coils and spark plug. The dealership then discovered that one cylinder had no compression and was cracked. Plaintiff Gonzalez was charged over $7500.00 for the repairs.

25.     The photographs below show the four pistons which were removed from Plaintiff's vehicle.





26.     Plaintiff Gonzalez's vehicle remains subject to the Piston Defect because the replacement parts also suffer from the inherent defect, having been

sourced from VWGoA.

27.     At all times, Plaintiff Gonzalez, like all Class Members, attempted to drive his vehicle in a manner both foreseeable and in which it was intended to be used, in the sense that he has driven it like a typical consumer and not used it for drag racing, for example.  At all times, Plaintiff Gonzalez has properly maintained his vehicle, bringing it exclusively to Audi authorized dealers for service.

28.     Although Plaintiff Gonzalez is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on VW's advertising for or labeling of the vehicles.

**Defendants**

29.     Defendant VWGoA is an entity incorporated in New Jersey with its principal place of business and headquarters at 220 Ferdinand Porsche Drive, Herndon, Virginia 20171. At this facility, VWGoA coordinates the United States operations and activities of the Volkswagen, Audi, Bentley, Bugatti, and Lamborghini brands, as well as the activities of its 8,000 employees and its subsidiary, VW Credit, Inc.  One of VWGoA's fictious names is Audi of America, Inc., which it has registered with the Virginia Secretary of State.

30.     Defendant VWGoA, through its various entities, markets, distributes, warranties, and sells Volkswagen and Audi-branded automobiles and parts for those automobiles, including the Class Vehicles, in multiple locations across the

United States, including New Jersey.  There are thirteen authorized Audi

dealerships in New Jersey, including Audi Englewood and Ray Catena Audi

Freehold, the largest Audi dealership in the United States.

31.     In order to sell vehicles to the general public, VWGoA enters into

agreements with authorized dealerships who engage in retail sales with consumers

such as Plaintiff. In return for the exclusive right to sell new Volkswagen and/or

Audi-branded vehicles, authorized dealerships are also permitted to service and

repair these vehicles under the warranties VWGoA provides directly to consumers

who purchased new vehicles from the authorized dealerships. All service and

repair at an authorized dealership is completed according to VWGoA, Audi AG,

and VWAG instructions, issued through service manuals, technical service

bulletins ("TSBs"), technical tips ("TT"), and other documents. Per the agreements

between VWGoA and the authorized dealers, consumers such Plaintiff are able to

receive services under VWGoA's issued warranty at dealer locations that are

convenient to them. These agreements provide VWGoA with a significant amount

of control over the actions of the authorized dealerships, of which there are nearly

1,000 in the United States.

32.     VWGoA also developed and disseminated the owner's manual and

warranty booklets, advertisements, and other promotional materials relating to the

Class Vehicles. VWGoA also is responsible for the content of the Monroney

11

Stickers on Volkswagen and Audi-branded vehicles.

33.     Defendant Volkswagen AG is an entity incorporated in and registered to do business in Germany with its principal place of business at Berliner Ring 2, 38440, Wolfsburg, Germany. This facility also encompasses a 70 million sq. ft. manufacturing facility, the Wolfsburg Volkswagen Plant, where over 800,000 vehicles are produced each year. The Wolfsburg headquarters also have individual production facilities, specialty production plants, warehouses, and administration buildings, with over 20,000 employees. VWAG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Volkswagen, Skoda, and Audi-branded vehicles and parts for those vehicles worldwide, including the in the United States.

34.     VWAG is the parent corporation of VWGoA and Audi AG, which are each wholly owned subsidiaries. VWAG is also the parent corporation of the United States manufacturing facilities for Volkswagen and Audi-branded vehicles. For all its United States subsidiaries, including VWGoA, VWAG and/or Audi AG provide all the technical and information for the purpose of manufacturing, servicing, and repairing the Class Vehicles. VWAG selected New Jersey for the original site of VWGoA's headquarters and chose to have VWGoA incorporated as a New Jersey entity.  Discovery will also show that VWAG made the decision to move VWGoA's headquarters to Virginia.

35.     Defendant Audi AG is an entity incorporated and registered in Germany with its principal place of business at Auto-Union-Str. 2 D-85045, Ingolstadt, Germany. The Ingolstadt facility encompasses both corporate offices which coordinate and supervise its worldwide operations, and a factory which produces over 300,000 vehicles a year, totaling over 30 million sq. ft.  As of the end of 2020, over 43,000 employees worked at this facility.  Audi AG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Audi-branded vehicles and parts for those vehicles worldwide, including in the United States.

36.     The relationship between VWAG and VWGoA is governed by a General Distributor Agreement that gives Audi AG and/or VWAG the right to control nearly every aspect of VWGoA's operations related to both Volkswagen and Audi-branded vehicles—including sales, marketing, management policies, information governance policies, pricing, and warranty terms.

37.     For all VWAG United States subsidiaries, including VWGoA, VWAG and/or Audi AG provides all the technical and information for the purpose of servicing, and repairing the Class Vehicles, as well as the information needed to draft the owners' manuals.

38.     At all relevant times, VW was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or

selling automobiles and motor vehicle components in San Diego County and throughout the United States of America.

## FACTUAL ALLEGATIONS

39.    For years, VW has designed, manufactured, distributed, sold, and leased the Class Vehicles. VW has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in New Jersey and nationwide. VW warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

40.    The 2.0T Engine is a four-cylinder turbocharged engine, designated as the second generation EA888 by VW.  In production since 2008, the 2.0T Engine was different from the first generation EA888 in that it had low-friction thin piston rings and newly designed pistons.

41.    As with most internal combustion engines, the piston slides into the cylinder bore of an engine block, transferring the force from expanding gas in the cylinder to the crankshaft via the crankpin.  See Figure 1 below. Pistons, such as the ones in the 2.0T engine, are cast aluminum alloy pieces which conduct and transfer heat.  Because aluminum expands when heated, both the piston and the cylinder bore must be manufactured precisely so that the piston can move freely without allowing the force of the combusting gas to escape.

14

FIGURE 1



42.     The piston head is the top of the piston, closest to the cylinder head.

Piston rings, which are settled into the piston grooves, seal the combustion

chamber, transfer heat to the cylinder wall, and control oil consumption.  As with

the piston itself, the piston rings must be manufactured to precise specifications, so

that they can provide a radial fit between the cylinder wall and the piston.

43.     The Class Vehicles contain one or more design, manufacturing, and/or

workmanship defects, including but not limited to defects wherein the pistons,

piston rings, and/or piston heads cause the piston rings to fail to seat properly.  As

a result, these components cannot withstand the heat and pressure of the engine and crack, fracture, or splinter.  Figures 2 and 3 below.  One result of the Piston Defect is that the engine can consume excessive amounts of oil.  Furthermore, the damage to the piston causes immediate loss of compression within the engine cylinder and causes the remnants of the piston to circulate throughout the fuel system of the Class Vehicles, damaging other engine components.

FIGURE 2[3]



FIGURE 3[4]

[3] Humble Mechanic, "Catastrophic Piston Failure 2.0t TSI Engine ~ Walkthrough and Diagnosis," Aug. 7, 2019, https://www.youtube.com/watch?v=V6jzRQpMw24 (last visited April 19, 2021)
[4] Figure 3 shows two of the defective piston heads taken from an A4 with the 2.0T Engine, as well as one from a Q5 with a 2.0T Engine which also suffered from the Piston Defect.



44.     VW acquired its knowledge of the Piston Defect within the 2.0T

Engine through sources not available to Plaintiff or Class Members, including but

not limited to pre-release testing data, early consumer complaints about the Piston

Defect to VW and its dealers about the Class Vehicles as well as other earlier

model year versions of such vehicles, testing conducted in response to those

complaints, aggregate data from VW's dealers, aggregate sales data of replacement

piston rings, pistons, and engines, and from other internal sources.

45.     The 2.0T Engine, since its widespread release by VW in 2009, has

proven to be nothing but problematic. Since its release, the 2.0T Engine has been

subject to many complaints, including but not limited to excessive oil consumption

and defective timing chains, both of which resulted in VW agreeing to extend its

warranty for timing chain systems and reimburse persons affects by such defect.

Presently, the 2.0T Engine in the Class Vehicles has caused VW to become aware

of the Piston Defect through many customers' complaints of loss of compression within an engine cylinder, metal shavings within the fuel system, and/or other forms of engine failure. All of these failures or sequelae of failures ultimately cause the catastrophic failure of the 2.0T Engine, the many of them before 75,000 miles. As such, many customers have had to completely replace their engines prematurely.

46.    Specifically, the 2.0T Engine's pistons/piston heads were defectively designed and/or manufactured to operate within the pressures and temperatures of the oil and fuel system, which in turn causes the piston rings and/or piston heads to crack, splinter, shatter, fracture, and/or break off into pieces within the engine cylinder. In turn, this causes loss of compression in one or more cylinders, triggering a "check engine light" for cylinder misfire due to loss of engine performance. Additionally, the pistons' constant engagement to tremendous forces and heat during normal engine operation will cause the piston head and/or piston rings to become faulty or fail, leading to excessive oil consumption, engine knock and/or pre-ignition, which can lead to undesirable pressure within the engine resulting in poor performance and engine damage, and oftentimes catastrophic damage.

**The Piston Defect Poses a Serious Safety Concern**

47.    As discussed supra, when a piston or piston suddenly and

18

unexpectedly fail, the Class Vehicles immediately lose partial or total engine power. When a vehicle loses partial engine power, it prevents the driver from accelerating or maintaining speed. If a vehicle loses total engine power, it will stall, prevent the driver from being able to adequately control the steering wheel and/or engaging the brakes properly. All of these situations drastically increase the risk of collisions, particularly at intersections and on highways.

### The Warranties Provided by VW for Audi-branded Vehicles

48.     VWGoA, under its business name of Audi of America, Inc., provides warranties directly to Plaintiff and consumers. This New Vehicle Limited Warranty covers "defects in manufacturer's material and workmanship," and is limited to "4 years or 50,000 miles from your vehicle's in-service date, which occurs first." This coverage includes the piston rings, pistons, and the engine and its other components.

49.     Despite the fact that the New Vehicle Limited Warranty is provided by VWGoA, the copyright to the warranty terms is held by Audi AG. As such, the warranty booklets provided to Plaintiff and consumers by VWGoA are done so with the explicit permission of Audi AG. Moreover, Audi AG is the author of the warranty terms.

50.     VWGoA also provides "Audi Certified pre-owned Limited Warranty" to vehicles purchased as "certified pre-owned" from authorized Audi dealerships.

This Certified Pre-Owned Warranty provides that "[i]f Audi New Vehicles Limited Warranty (NVLW) coverage remains at the time of Certified pre-owned (CPO) purchased, CPO Limited Warranty Coverage commences upon expiration of NVLW and continues until 5 years from vehicle's original in-service date with no mileage limitation.  If NVLW coverage has expired at time of CPO purchase, CPO Limited Warranty coverage continues for 12 months with no mileage limitation."

51.    The coverage terms of the CPO Limited Warranty are similar to the terms of the New Vehicle Limited Warranty.

52.    Unlike many car companies, VW does not make it owners' manuals and warranty booklets available online prior to purchase.  In order to access such materials on VW's websites, a consumer needs a Vehicle Identification Number. As such, the full warranty terms are presented to Plaintiff and consumers after the purchase, on a take-it-or-leave-it basis.

**VW Had Superior and Exclusive Knowledge of the Piston Defect**

53.    Since 2012, VW has designed, manufactured, distributed, sold, and leased the Class Vehicles. Because VW has been making the 2.0T engine since 2008, VW was acutely aware of the 2.0T engine's defective pistons and piston rings that caused oil consumption well before the Class Vehicles were offered for sale on the market.

54.    VW had superior and exclusive knowledge of the Piston Defect and

knew or should have known that the defect was not known or reasonably

discoverable by Plaintiff and Class Members before they purchased or leased the

Class Vehicles.

55.     Well before Plaintiff's purchase of his vehicle, VW knew about the

Piston Defect through sources not available to consumers, including pre-release

testing data, early consumer complaints to VW and its dealers, testing conducted in

response to those consumer complaints, high failure rates of the pistons within the

2.0T Engine, the data demonstrating the inordinately high volume of replacement

part sales, and other aggregate data from VW dealers about the problem.

56.     VW is experienced in the design and manufacture of consumer

vehicles. As an experienced manufacturer, VW conducts tests, including pre-sale

durability testing, on incoming components, including the pistons, to verify the

parts are free from defect and align with VW's specifications.[5] Thus, VW knew or

should have known the pistons within the 2.0T Engine were defective and prone to

put drivers in a dangerous position due to the inherent risk of the Piston Defect.

57.     Specifically, VW's preproduction testing includes extensive road

_____

[5] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM,
http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-
testing.htm ("The idea behind car testing is that it allows manufactures to work out
all the kinks and potential problems of a model before it goes into full
production.") (last viewed June 5, 2019).

testing at its proving grounds in Ehra-Lessien, Germany.  There, testing includes

materials testing for engine components and VW is known to be spend more for

research and development than any other major vehicle manufacturer in the world

and produces far more pre-production vehicles.[6]  In fact, VW even mistakenly sold

nearly 7,000 pre-production models, which were meant to be destroyed, to

consumers. [7]  The pre-production testing on the 2.0T engines revealed the Defect to

VW.

58.     Additionally, Defendants should have learned of this widespread

defect from the sheer number of reports received from dealerships. VW's customer

relations department, which interacts with individual dealerships to identify

potential common defects, has received numerous reports regarding the Piston

Defect, which led to the release of the Technical Tips for its pre-2012 2.0T Engine.

VW's customer relations department also collects and analyzes field data

including, but not limited to, repair requests made at dealerships, technical reports

prepared by engineers who have reviewed vehicles for which warranty coverage is

being requested, parts sales reports, and warranty claims data.

---

[6] Christiaan Hetzner, *Inside Volkswagen's secret Ehra-Lessien proving grounds*, AUTOWEEK.COM,
https://www.autoweek.com/news/technology/a1828046/volkswagens-secret-ehra-lessien-proving-grounds/ (last viewed April 19, 2021).

[7] Kyle Hyatt, *VW sold at least 6,700 preproduction cars to consumers and that's not good*, CNET.com, https://www.cnet.com/roadshow/news/vw-preproduction-test-cars-sold-to-public/ (last viewed April 20, 2021)

59.    VWGoA's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is VWGoA's policy that when a repair is made under warranty the dealership must provide VWGoA with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed. As a result of analyzing the requests for warranty repairs, Defendants would have learned about the ongoing nature of the Piston Defect.

60.    Federal law requires automakers like VW to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

61.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id.* Thus, VW

23

knew or should have known of the many complaints about the Piston Defect

logged by NHTSA ODI. The content, consistency, and disproportionate number of

those complaints alerted, or should have alerted, VW to the Piston Defect in its

2.0T Engines as early as 2012.

62.     With respect solely to the Class Vehicles, the foregoing excerpts of

owner incident reports are but a few examples of the many complaints concerning

the Piston Defect which are available through NHTSA's website,

www.NHTSA.gov. Many of the complaints reveal that VW, through its network of

dealers and repair technicians, had been made aware of the Piston Defect. In

addition, the complaints indicate that despite having knowledge of the Piston

Defect and even armed with knowledge of the exact vehicles affected, VW often

refused to diagnose the defect or otherwise attempt to repair it while Class

Vehicles were still under warranty. When VW did attempt repairs, it merely

replaced the defective pistons with similarly defective pistons.

63.     On September 15, 2015, a class vehicle driver reported the following

incident dated September 15, 2015:[8]

> EXCESSIVE    OIL    CONSUMPTION.    UNDER
> NORMAL DRIVING CONDITIONS, THE ENGINE
> LIGHT CAME ON TO ADD 1 QUART OF OIL 3,000
> MILES BEFORE THE NEXT SERVICE INTERVAL.
> ONLY 22,000 MILES ON THE CAR.

[8]https://www.nhtsa.gov/vehicle/2015/AUDI/A4/4%252520DR/AWD#complaints

64.     On October 13, 2014, a class vehicle driver reported the following

incident dated August 14, 2014:[9]

> I GOT A LOW OIL WARNING WITH ONLY 2700
> MILES ON THE CAR, AND THE OIL IS DARK AND
> DIRTY COMPARE TO THE LONER CAR I GOT.
> IT HAS BEEN THREE TIMES I BROUGHT MY CAR
> BACK TO THE SERVICE DEPARTMENT IN THE
> DEALER, BUT THEY NEVER SOLVED THE
> PROBLEM. FIRST TIME, THEY TOPED UP THE OIL.
> AFTER TWO WEEKS, THE OIL WAS LOW AGAIN,
> SO I BROUGHT IT BACK. THIS TIME, THEY
> CHANGED A NEW OIL TANK CAP FOR ME, BUT
> TWO WEEKS LATER, THE OIL WAS LOW. I DROVE
> IT BACK TO THE SERVICE, THIS TIME ACTUALLY
> THE AUDI COMPANY TOLD ME THAT IS
> BECAUSE MY CAR IS STILL IN BREAK-IN PERIOD
> AND JUST TOPPED UP THE OIL AGAIN. BUT AS
> AN ENGINEER, I KNOW IT CANNOT BE 2 QT PER
> 1000 MILES.

65.     On April 6, 2018, a class vehicle driver reported the following

incident dated March 5, 2018:

> LOST COMPRESSION AT ONLY 43,670 MILES TO
> FOURTH CYLINDER. ENGINE WAS REBUILT BY
> AUDI DEALER. FOUND PIECES OF OIL CONTROL
> RING FROM A PISTON IN OIL PAN, AIR LEAKING
> THROUGH INTAKE, SEATING SURFACE FOR
> INTAKE VALVE NUMBER 2 ON CYLINDER 4 WAS
> BURNT AND UNABLE TO SEAT PROPERLY DUE
> TO SPRING ON THAT VALVE BEING WEAKER
> THAN OTHERS.

66.     On January 25, 2016, a class vehicle driver reported the following

incident dated June 4, 2015:[10]

---

[9] https://www.nhtsa.gov/vehicle/2015/AUDI/A3

[10] https://www.nhtsa.gov/vehicle/2015/AUDI/Q3

> THE CONSUMER ALSO STATED THE VEHICLE
> BURNED 1/4 QUART OF OIL EVERY 5,000.

67.   On September 11, 2018, a class vehicle driver reported the following

incident dated August 19, 2018:

> I JUST BOUGHT THE CAR FROM LEASING IT IN
> MAY 2018.THEY DID A INSPECTION AT AUDI
> AND ABOUT 3 WEEKS LATER THE ENGINE GOT
> STUCK AND CAR SMOKED FROM HOOD.

68.   On February 25, 2020, a class vehicle driver reported the following

incident dated February 15, 2020:[11]

> WHILE IN MOTION ON A DARK COUNTRY ROAD
> IN VT, MY 2015 AUDI Q5 CAR WITH JUST 61,000
> MILES ON IT STARTED TO MAKE A LOUD NOISE
> AND BECAME UNDRIVABLE. THE DRIVER SAT
> ON THE ROAD AND WAITED FOR ROADSIDE
> ASSISTANCE AND A TOW TRUCK TO TAKE THE
> CAR TO THE NEAREST AUDI DEALER, WHICH
> WAS 40 MILES AWAY. SEVERAL DAYS LATER,
> AUDI DRAINED THE OIL IN THE ENGINE AND
> FOUND METAL SHAVINGS.

69.   On August 7, 2018, a class vehicle driver reported the following

incident dated July 8, 2018:

> TL* CONTACT OWNS A 2015 AUDI Q5. AFTERTHE
> VEHICLE UNDERWENT AN OIL CHANGE, THE
> OIL      CHANGE      WARNING      INDICATOR
> ILLUMINATED.  THE  CONTACT  MENTIONED
> THAT THE OIL NEEDED TO BE REFILLED EVERY
> 1,000   MILES.  THE  VEHICLE  WAS  TAKEN  TO
> FATHERS & SONS AUDI WEST SPRINGFIELD (434
> MEMORIAL AVE, WEST SPRINGFIELD, MA 01089,
> (413) 384-5229) WHERE THE OIL CONSUMPTION
> TEST SHOWED HOW MUCH OIL WAS BURNED
> AND THAT THE PISTONS WERE DAMAGED. THE

---

[11] https://www.nhtsa.gov/vehicle/2015/AUDI/Q5/SUV/AWD

DEALER STATED THAT THE PISTON AND SOLENOID NEEDED TO BE REPAIRED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE.

70.     On November 5, 2020, a class vehicle driver reported the following

incident dated January 1, 2019:[12]

THIS VEHICLE IS NEEDING A QUART OF OIL EVERY 300-400 MILES. IT'S A 6 YEAR OLD CAR, THERE IS SOMETHING SERIOUSLY WRONG WITH AUDI ENGINE DESIGN. A QUART OF OIL EVERY 300-400 MILES IS COMPLETELY UNACCEPTABLE. SINCE DAY 1 THIS VEHICLE HAS HAD AN OIL CONSUMPTION PROBLEM NOW AT 75K MILES AND THE PROBLEM JUST CONTINUES TO GET WORSE.

71.     On March 24, 2017, a class vehicle driver reported the following

incident dated January 24, 2017:

TL* THE CONTACT OWNS A 2014 AUDI A4. WHILE DRIVING 55 MPH, THE VEHICLE BEGAN TO SHAKE. THE DEALER DETERMINED THAT THE PISTONS IN THE ENGINE LOST COMPRESSION AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 62,000.

72.     On April 4, 2019 a class vehicle driver reported the following incident

dated April 1 2019:[13]

EPC LIGHT ILLUMINATED, ROUGH IDLING, LOSS OF POWER, CAR WILL NOT TURN ON. 2017 IT DID THE SAME THING, FOUND ELECTRICAL FAULT NEAR GAS TANK (COULD HAVE BLOWN UP).

---

[12] https://www.nhtsa.gov/vehicle/2014/AUDI/A4/4%252520DR/AWD
[13] https://www.nhtsa.gov/vehicle/2013/AUDI/A4/4%252520DR/AWD

> AUDI FIX AT GOODWILL. COMPRESSION OF ENGINE WAS NEVER CHECKED. 2019 SAME THINGS HAPPENING, ENGINE LOST COMPRESSION IN 2 CYLINDERS. ALL SERVICES DONE AT AUDI. TOLD NEW ENGINE $10K-13K AND THEY WILL NOT HELP COVER COSTS. ONLY 60'000 MILES DONE ON THE CAR AND NO OVERHEATING ISSUES EVER.

73.    On February 27, 2019, a class vehicle driver reported the following

incident dated February 21, 2019:

> I AM CONSUMING 1.66 QUARTS IN 600 MILES WHICH HAS BEEN DOCUMENTED BY MY LOCAL AUDI DEALER. I WAS TOLD CALL AUDI USA CUSTOMER SUPPORT TO START CLAIM. I DID AND WAS TOLD THEY UNDERSTAND THAT MY CAR HAS AN ISSUE BUT SINCE IT DID NOT FALL IN THE YEARS OF CLASS ACTION LAWSUIT THEY WOULD NOT BE ABLE TO ASSIST IN ANY MATTER. NOW I HAVE DONE MY HOMEWORK AND HAVE FOUND AUDI DOES MAKE EXCEPTIONS BUT WILL DO NOTHING IN MY CASE. UNFORTUNATELY I CAN NOT UPLOAD DOCUMENTS FROM AUDI BECAUSE IT HAS ALL MY INFORMATION AND VEHICLE IDENTITY. BUT I CAN SAY MY AUDI CASE NUMBER IS [XXX].
> SO MAYBE AUDI CAN RESPOND TO MY CLAIM IN THE APPROPRIATE WAY AND EXTEND THEIR HELP TO OTHER VEHICLES WITH THE SAME ENGINE.

74.    On March 25, 2019, a class vehicle driver reported the following

incident dated February 6, 2019:

> THE CAR HAS BEEN BURNING THROUGH OIL. IT HAS BEEN REQUESTING A QUART OF OIL BE ADDED JUST ABOUT EVERY 500-700 MILES. ABOUT A YEAR AGO THE PROBLEM STARTED IN EARLY 2019 AND AT FIRST IT WAS JUST EVERY 1200-900 MILES THAT THE CAR WOULD ASK FOR AN EXTRA QUART OF OIL. THEN IN THE PAST 6

> MONTHS IT HAS GOTTEN WORSE ASKING FOR A
> QUART OF OIL EVERY 500-700 MILES; THIS IS
> ALL IN ADDITION TO THE REGULARLY
> SCHEDULE OIL CHANGES.

75.     On March 7, 2019, a class vehicle driver reported the following

incident dated August 16, 2018:[14]

> TL* THE CONTACT OWNS A 2016 AUDI Q3. THE
> CONTACT STATED THAT THE VEHICLE WOULD
> NOT START PROPERLY AND WOULD
> CONSTANTLY DECELERATE WHILE IN THE
> MIDDLE OF TRAFFIC. THE CONTACT
> EXPERIENCED THE FAILURES OFTEN. ALSO, THE
> CHECK ENGINE INDICATOR ILLUMINATED. THE
> VEHICLE WAS TOWED TO AUDI DOMINION
> (21105 I-10, SAN ANTONIO, TX 78257, (888) 478-
> 2089) WHERE IT WAS DIAGNOSED THAT A NEW
> FUEL SENSOR NEEDED TO BE INSTALLED. THE
> VEHICLE WAS REPAIRED, BUT THE FAILURES
> RECURRED. THE CONTACT TOOK THE VEHICLE
> BACK TO THE DEALER AND HAD IT REPAIRED
> AGAIN, BUT THE FAILURES RECURRED. DURING
> THE THIRD REPAIR, THE DEALER BROKE ONE OF
> THE HEADLIGHTS. SINCE THEN, THE FAILURES
> RECURRED MULTIPLE TIMES. THE
> MANUFACTURER WAS NOTIFIED AND DID NOT
> ASSIST. THE FAILURE MILEAGE WAS 49,500.

76.     On August 23, 2018, a class vehicle driver reported the following

incident dated August 15, 2018:

> WHEN STARTING VEHICLE (EITHER COLD OR
> WARM), VEHICLE HAS A SEVERAL SECONDS
> HESITATION WHEN PUSHING DOWN
> ACCELERATOR. VEHICLE DOES NOT MOVE,
> HESITATES THEN LURCHES FORWARD AS IF THE
> VEHICLE IS NOT GETTING SUFFICIENT POWER
> TO MOVE. VEHICLE HAS BEEN TO THE
> VOLKSWAGEN DEALER SEVERAL TIMES AND

---

[14] https://www.nhtsa.gov/vehicle/2016/AUDI/Q3/SUV/FWD

> THEY HAVE BEEN UNABLE TO REPAIR. THIS IS
> DANGEROUS WHEN YOU ARE ENTERING A
> HIGHWAY OR CROSSING A MULTI LANE ROAD
> AND HAVE TO MOVE QUICKLY AND THE
> VEHICLE DOES NOT RESPOND.

77.     On January 21, 2021, a class vehicle driver reported the following

incident dated January 21, 2021:[15]

> SEVERAL COMPLAINTS OF FAULTY PISTON
> RINGS CAUSING OIL CONSUMPTION TO BE 1
> QUART EVERY 200/300 MILES FROM AUDI A4
> MODELS 2009-2015.

78.     On November 5, 2019, a class vehicle driver reported the following

incident dated November 3, 2019:

> PISTON RINGS CAR IS SMOKING AND OIL IS
> COMING OUT OF THE MUFFLER THE CAR HAVE
> LAST THEN 100K MILEAGE.

79.     On September 26, 2018, a class vehicle driver reported the following

incident dated August 24, 2018:

> 2012 AUDI A4 QUATTRO USES (BURNS) AN
> EXCESSIVE AMOUNT OF OIL, CONSTANTLY
> HAVING TO ADD MOTOR OIL. MUST ADD A
> QUART OF OIL ON A MONTHLY BASIS AND
> DRIVING LESS THAN 1,000 PER MONTH.

80.     On November 1, 2018, a class vehicle driver reported the following

incident dated November 6, 2016:

> EXCESSIVE OIL CONSUMPTION ISSUES, CHECK
> ENGINE LIGHT IS ON AND AUDI WANTS TO
> CHARGE ME $12,000 TO REPAIR THE OIL
> CONSUMPTION DUE TO THEIR BEING DAMAGE
> TO MY PISTON RINGS.

---

[15] https://www.nhtsa.gov/vehicle/2012/AUDI/A4/4%252520DR/FWD

81.     On October 1, 2018, a class vehicle driver reported the following

incident dated September 30, 2018:

> THE      VEHICLE      HESITATES      WHEN
> ACCELERATING FROM A STOP OR OCCAISINGLY
> SURGES UNDER HEAVIER THROTTLE PRESSURE.
> THIS IS VERY DANGEROUS AND THE DEALERS
> ARE TELLING US THIS IS "NORMAL" BEHAVIOR.
> I SEE THAT MANY DRIVERS HAVE REPORTED
> THIS  ISSUE.  DOES  SOMEONE  HAVE  TO  GET
> INJURED BEFORE WE GET TAKEN SERIOUSLY?
> VOLKSWAGEN NEEDS  TO  FIX  THE  PROBLEM
> WITH THE ENGINE NOW.

82.     On April 24, 2017, a class vehicle driver reported the following

incident dated April 4, 2017:

> I TURNED CAR OFF, WENT INTO A STORE CAME
> BACK,  STARTED  CAR  AND  IT  SOUNDED
> HORRIBLE,  AS  IF  TOTALLY  FALLING  APART.
> TURNED IT OFF, TRIED AGAIN AND WOULD NOT
> START AT  ALL.  DEALER  SAID  ENGINE  WAS
> SHOT, SEIZED UP HAS TO BE REPLACED. THEY
> HAVE BEEN MAINTAINING IT SINCE THE DAY I
> BOUGHT IT. OIL CHANGES ALL UP TO DATE.
> 30,000 MILE OUTSIDE OF WARRANTY. DEALER
> HAS NO UNDERSTAND OF WHAT COULD HAVE
> HAPPENED.  COULD  THIS  HAVE  HAPPENED
> WHEN I WAS DRIVING? NO IDEA. HAS ANYONE
> HEARD OF THIS HAPPENING TO THEIR AUDI A4
> 2012?

83.     On July 6, 2020, a class vehicle driver reported the following incident

dated June 11, 2020:[16]

> ONLY  500  MILES  FOLLOWING  AN  AUDI  OIL
> CHANGE,  THE  OIL  SENSOR  LIGHT  WENT  OFF
> NOTIFYING US TO ADD ONE QUART OF OIL. WE

---

[16] https://www.nhtsa.gov/vehicle/2016/AUDI/A4/4%252520DR/AWD

> ADDED ONE QUART OF OIL AND CONTINUED DRIVING AND THEN THE LIGHT WENT OFF AGAIN. WE CALLED AUDI SERVICE AND THEY TOLD US TO FOLLOW THE INSTRUCTIONS AND ADD ANOTHER QUART OF OIL. WE DID AND REPEATED ONE MORE TIME AFTER ANOTHER HOUR (75 MILES). AFTER FILLING THE THIRD TIME AND DRIVING, WHITE SMOKE STARTED BILLOWING FROM THE VEHICLE AND WE HAD THE CAR TOWED TO THE AUDI DEALERSHIP 233 MILES FROM WHERE WE WERE.

84.   On November 6, 2020, a class vehicle driver reported the following incident dated October 28, 2020:

> BOUGHT IT 7 WEEKS AGO, 44,000 MILES. SEVERE OIL CONSUMPTION PROBLEM I'M FINDING OUT EVERYONE KNOWS ABOUT ALREADY WITH AUDI TURBOS AND WAS PREVIOUSLY A CLASS ACTION. I'M PUTTING OIL IN EVERY OTHER DAY AND FEEL THE PISTONS MISSING WHEN I DRIVE IN THE MORNING.

85.   On November 18, 2019, a class vehicle driver reported the following incident dated August 1, 2019:[17]

> TL* THE CONTACT OWNS A 2014 AUDI Q5. WHILE THE VEHICLE WAS PARKED OUTSIDE OF THE CONTACT'S RESIDENCE, THE CHECK ENGINE OIL WARNING INDICATOR ILLUMINATED WHEN THE VEHICLE WAS STARTED. THE CONTACT STATED THAT SHE NEEDED TO ADD OIL TO THE ENGINE EVERY TWO WEEKS. THE VEHICLE WAS TAKEN TO BIENER AUDI (LOCATED AT 795 NORTHERN BLVD, GREAT NECK, NY 11021, (516) 829-2834) THREE TIMES. ON OCTOBER 13, 2019, THE CONTACT WAS INFORMED THAT THE PISTON SIZES WERE TOO SMALL AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE

---

[17] https://www.nhtsa.gov/vehicle/2014/AUDI/Q5/SUV/AWD

MILEAGE WAS 81,886.

86.     On October 3, 2018, a class vehicle driver reported the following

incident dated September 13, 2018:

> TL* THE CONTACT OWNS A 2014 AUDI Q5. WHILE
> DRIVING 70 MPH, THE ENGINE TURNED OFF AND
> THE ELECTRONIC POWER CONTROL INDICATOR
> ILLUMINATED. THE VEHICLE WAS TOWED TO
> AUDI SAN DIEGO (9010 MIRAMAR RD, SAN
> DIEGO, CA 92126) AND REMAINED THERE FOR
> THREE WEEKS. THE MANUFACTURER WAS
> ALSO CONTACTED AND DID NOT ASSIST. THE
> VEHICLE WAS NOT DIAGNOSED OR REPAIRED.
> THE APPROXIMATE FAILURE MILEAGE WAS
> 37,000. THE VIN WAS UNAVAILABLE. *TR.

87.     On August 29, 2018, a class vehicle driver reported the following

incident dated July 31, 2018:

> WHILE DRIVING THE CAR, CAR SUDDENLY
> STOPPED... A LOT OF LIGHTS CAME ON IN THE
> DASHBOARD. THERE WAS A BURNING SMELL
> INSIDE THE CAR. CAR WOULDN'T START AFTER
> THAT AND HAD TO BE MANUALLY PUSHED TO
> THE SIDE OF THE ROAD.
> AUDI SERVICE INSPECTED THE CAR AND SAID
> THAT ENGINE HAD INTERNAL DAMAGE AND I
> WAS ASKED TO REPLACE THE ENGINE. CAR
> ONLY HAD 35,000 MILES ON IT. WARRANTY HAD
> EXPIRED JUST FEW MONTHS EARLIER. I HAD
> GOTTEN SERVICE DONE EVERY YEAR AT THE
> SAME AUDI SERVICE DEALERSHIP AND HAD
> GOTTEN A SERVICE JUST A FEW WEEKS BEFORE
> THIS HAPPENED! I WAS ASKED TO REPLACE THE
> ENGINE AT MY COST!! LATER I WAS OFFERED
> ASSISTANCE FROM AUDI, BUT IT STILL COST ME
> $4,500 OUT OF MY POCKET FOR A 4 YR OLD CAR
> WITH 35K MILES ON IT AND SERVICED EVERY
> YEAR BY AUDI!! LOST FAITH IN THE AUDI
> BRAND AND THE LOCAL AUDI DEALERSHIP &
> SERVICE.

88.    On May 29, 2019, a class vehicle driver reported the following

incident dated May 5, 2019:[18]

> THE VEHICLE SUFFERED COMPLETE ENGINE
> FAILURE AT 52,000 MILES. ON MAY 05'19 THE
> CAR WAS RUNNING SMOOTHLY AT PREVAILING
> HIGHWAY SPEED WHEN I STARTED TO HEAR
> THE SOUND OF MARBLES RATTLING AROUND IN
> THE ENGINE COMPARTMENT. PULLED OVER,
> AND THEN THE CHECK ENGINE LIGHT CAME ON.
> TOWED TO AUDI BURLINGTON, AND THE $159
> DIAGNOSTIC THE FOLLOWING MORNING MAY
> 06'19 RESULTED IN A VOICE MAIL THAT SAID IN
> PART "CAR ENGINE IS BLOWN, THE COST WILL
> BE $11,000, PLEASE LET US KNOW WHAT YOU'D
> LIKE TO DO". THEY ALSO SUGGESTED I COULD
> TRY TO GET AUDI OF AMERICA TO ASSIST SO I
> OPENED A TICKET WITH THEM ON MAY 07'19
> (REFERENCE NUMBER IS 190452228).
> THE SERVICE HISTORY IS INTACT BUT NEITHER
> AUDI OF AMERICA NOR AUDI BURLINGTON
> (MA) DEALERSHIP WILL ASSIST WITH THE
> REPAIR.

89.    On February 17, 2016, a class vehicle driver reported the following

incident dated April 1, 2015:[19]

> IT CAME TO MY ATTENTION AT 70,000 MILES
> THAT I HAD TO OCCASIONALLY ADD OIL
> BETWEEN OIL CHANGES. AT 95,000 MILES THE
> OIL CONSUMPTION INCREASED. CURRENTLY AT
> 100,000 MILES OIL CONSUMPTION INCREASED TO
> A QUART OF OIL EVERY 1000 MILES. TWO AUTO
> REPAIR BUSINESSES, INCLUDING SHEARER AUDI
> OF SOUTH BURLINGTON VERMONT, HAVE
> LOOKED AT MY CAR. EACH REPAIR BUSINESS
> TELLS ME THAT THERE ARE TWO COSTLY

---

[18] https://www.nhtsa.gov/vehicle/2013/AUDI/A5/C/AWD

[19] https://www.nhtsa.gov/vehicle/2012/AUDI/Q5/SUV/AWD#complaints

POSSIBILITIES TO FIX THE CAR. THE BOTTOM LINE IS THAT IT SEEMS TO NEED A NEW ENGINE BLOCK AND PISTONS AND ALL. IT SEEMS THAT THE SHEARER AUDI SERVICE REP SHOULD HAVE WARNED ME THAT THERE MIGHT BE A PROBLEM WITH THE OIL CONSUMPTION BEFORE MY AUDI'S WARRANTY WAS UP. IT ALSO SEEMS THAT THE 2012 Q5 SHOULD HAVE BEEN INCLUDED IN THE CLASS ACTION OIL CONSUMPTION LAW SUIT. AS YOU ARE AWARE, AUDI HAS BEEN AWARE OF THIS DEFECT FOR YEARS AND YET THE 2012 2.0T ENGINE DOES NOT SEEM TO BE REDESIGNED TO FIX THE PROBLEM.

90.    In addition to VW's review of NHTSA complaints, discovery will show that VW's internal consumer relations department and/or online reputation management services routinely monitor the internet for complaints about its products, including complaints posted on consumer forums and other social media websites. The fact that so many customers made similar complaints put VW on notice of the Piston Defect.

91.    On March 20, 2014, a class vehicle driver reported the following incident on an online forum:[20]

Car's a 2011 A4 with 35k miles on board, APR stage 1 tuned, all stock otherwise. I had a cylinder misfire that turned out to be a blown piston ring.

92.    On May 11, 2017, a class vehicle driver reported the following

---

[20] https://www.audizine.com/forum/showthread.php/587234-APR-tuned-A4-piston-failure

incident on an online forum:[21]

> Anybody had an issue with a newish vehicle mine's a 2012 2.0 TFSI with 44,000 miles. Massive Piston fail scored the bore hole and knackered the engine, managed to get a used engine but it still cost me £2700.00!!

93.     On May 18, 2016, a class vehicle driver reported the following

incident on an online forum:[22]

> For those of you who haven't looked at my last post. I'll catch you up real fast. Last week driving at 65-70mph (the speed limit) on my way back home to base. Car decides to go into limp mode while I'm in the fast lane (dangerous) barely got over in time. Got pulled over. Pulled codes. Misfire cyl 2 and random misfire. Cool. I'm at 63k miles LOW MILES…. Get to compression test. Test #1 cyl 1, good. Cyl 2, 0% compression

94.     On May 20, 2016, a class vehicle driver reported the following

incident on an online forum:[23]

> I've got a 2012 with just under 40K miles and my car is currently in the shop having new pistons put in. Driving around town, limp mode, run codes, cylinder one misfire, swap coils and plugs, no change. Leak down test shows 0% compression and Audi diagnosis is fried rings. Their labor only cost to replace only the rings in one piston - $4,800! It's currently at my indy shop where he found a broken piston on a car with less than 40,000 miles!

---

[21] https://www.audi-sport.net/xf/threads/broken-piston-on-2012-black-edition-a4.324604/

[22] https://www.audizine.com/forum/showthread.php/708042-My-misfire-no-compression-Audi-experience

[23] https://www.audizine.com/forum/showthread.php/708042-My-misfire-no-compression-Audi-experience

95.     On August 3, 2017, a class vehicle driver reported the following

incident on an online forum:[24]

> I own a 2012 Q5 2.0 PP with approx 115000 miles The month I paid it off (last dec) the car began burning oil at a very fast rate. My car was just over the extended warranty I purchased also. When I took in the car for a small recall they informed me there was another recall. Some valve don't remember what its called but I knew through research of the oil burning it was part of the oil consumption test. I hoped it would fix the problem to no avail. Was informed they couldn't do anything. Spoke with everyone until I reached the GM.. The GM spoke with Audi corp and agreed to do and pay for the oil consumption test. It failed. They agreed to replace the pistons and rings at no cost to me which I was very grateful BUT it did not fix the problem. My wife has since driven 5000 miles and is on her third top off. She is burning approx 1100 miles per qt

96.     On July 29, 2016, a class vehicle driver reported the following

incident on an online forum:[25]

> I'm a writer with Middleburg Heights Audi in Ohio. And its still a very prevalent problem. Just next week alone we have scheduled 4 2.0 TFSI engines for piston replacement covered under Audi. Out technician alone has done over 800 of these by himself.

97.     On April 21, 2018, a class vehicle driver reported the following

incident on an online forum:[26]

> The ring lands broke off one piston in this vehicle. The

---

[24]https://www.audizine.com/forum/showthread.php/776083-Q5-burning-oil-post-piston-ring-replacement

[25]https://bobistheoilguy.com/forums/threads/audi-broken-oil-control-rings-why.257011/

[26]https://diag.net/msg/md8ij6sq56novw2yrngi8kyym4

consensus from my previous post was the failure was the result of LSPI (low speed pre ignition). There is just the lightest of scratches in the bore of the broken piston while the rest of the bores look perfect. We are going to replace the pistons, rings, and rod bearings in this motor. My question is whether to hone the cylinders. The dealers replace rings and pistons in these vehicles all the time for oil burning. They do not hone the cylinders as far as I can tell. Does it make sense to put new rings and pistons without brush honing the cylinders? The engine has only 45 000 miles.

98.     On August 26, 2019, a class vehicle driver reported the following

incident on an online forum:[27]

My car is burning a lot of oil, probably 1 quart every 1200 miles. It is manageable but I can imagine this is good for the vehicle. I hope this will not require an engine rebuild.

99.     On May 15, 2019, a class vehicle driver reported the following

incident on an online forum:[28]

I recently purchased B8 A4 Quattro Prestige 6 Speed Manual. It's never been modded and had Audi service/maintenance plan up to 65K. Currently, it has around 83K miles. Car looks sexy and super tight on the road BUT it came with a CEL and on and off PEC light at times. I did basic diagnosis at home, it showed P0303 Cylinder 3 Misfire Detected. Like everyone else, I changed the coils, plugs = same issue continues to exist. Car runs rough and engine is shaky at low RPM. My next DIY fix was going to be fuel injector on 3. While I was at local Audi dealership for something different, I talked to a service adviser. He pulled up my VIN and showed me my car is under extended warranty from Audi for injectors 10Yr/120K & timing chain 10Yr/100K. He

---

[27]https://www.audiworld.com/forums/q5-sq5-mki-8r-discussion-129/2013-audi-q5-oil-consumption-2978462/

[28]https://www.audizine.com/forum/showthread.php/856065-2012-A4-B8-Cylinder-3-Misfire-No-Compression-Engine-Issue-Dilemma

promised they would change the injectors under this warranty. I later found out there's a class-action lawsuit settlement for timing chain related issues (hmm.. interesting right). He said I wouldn't have to pay anything out of pocket if I authorize them to replace the faulty injectors. If not, I'd be responsible for the $190 diagnostics fee. Few days later, I drop off my car to service hoping them to replace the injectors FREE and they gave me loaner car. He said they normally lend them to 2015 and up owners but he made it happen. He calls me later that same day and says "there's a misfire but the cylinder is bad, really bad because during the leak-down test the piston is shot". I am shocked at this point and confused why would a piston go bad on a well maintained car.

100.    On October 9, 2012, a class vehicle driver reported the following

incident on an online forum:[29]

Purchased audi a4 used at yonkers auto mall. live in ct have been to new york twice and now about to go third time monday consumes oil and dealership repair shop keeps stating this is normal and in spec pleaese help.

101.    On December 6, 2012, a class vehicle driver reported the following

incident on an online forum:[30]

I had the same problem ,erery month the audi a4 say on the computor that a qt of iol need needed and the oil is too low.I just brought this car from a dealer on boston rd about 5 month ago for 23000$ and finance through bank.What can i do ,this car is a lemon

102.    On March 20, 2013, a class vehicle driver reported the following

---

[29]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[30]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

incident on an online forum:[31]

> I just purchased a a4 2.0t wagon on feb. 9 from private person. oil light came on 3 days after purchase. come to find out this is a common problem. took it to dealer for oil consumption test. – it failed and was determined it needed a $4200 piston ring replacement. no warranty, contacted audi of america several times and they refuse to pay for the repair. Furious

103.   On August 21, 2013, a class vehicle driver reported the following

incident on an online forum:[32]

> My car is being serviced right now at Audi of Melbourne. I have a 2012 a4 2.0 T. My engine low oil light came on. They are replacing numerous parts all related to this oil issue. They continue to sell cars and do not inform the public or customer about this issue knowing full well about it. The service manager stated they are replacing these particular parts in many vehicles. I expected to buy an Audi and get the highest quality of vehicle but, so far that is not the case

104.   On October 10, 2013, a class vehicle driver reported the following

incident on an online forum:[33]

> Purchased a new 2013 Audi Q7 10 months. Love the car but just had my first oil light issue at 9551 miles. Dealer serviced at 5000. Dealer now claims the oil was slightly over filled which caused the warning light to illuminate. I've never heard of such a thing for an oil light function, low yes but overfilled? Implied we may have overfilled but have never even opened the hood. All services have been by the dealership

---

[31]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[32]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[33]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

105.    On December 27th, 2013, a class vehicle driver reported the following

incident on an online forum:[34]

> I have a 2013 Audi A6. I have called the service desk
> repeatedly regarding the oil consumption issue (light
> would come on between 1,500-3,000 miles after being
> serviced). Each time I have been told that this is normal
> (one of the service reps even tried saying that every 1k
> miles is normal!). Looking at my email conversation I
> had with the dealership this problem goes back to May
> of 2012. Not too long ago I brought my car in for the
> 45k service, and already I am getting the low oil
> notification (I am at 48k). Looks like I will be calling
> the dealership again about this issue.

106.    On January 22, 2014, a class vehicle driver reported the following

incident on an online forum:[35]

> I recently reported Jan 6. I had the consumption test
> done and Audi replaced "crankcase breather valve, seal
> and separator". Advised 2 things: – that those having
> the same issue, the service work I just had completed
> usually fixes the problem. Also advised, to monitor the
> oil and if light comes on under 1500 miles to return for
> "phase 2" of test. When asked what phase 2 entailed,
> told that depending on test a call to AudiofAmerica
> headquarters would be necessary for next steps.
> Hopefully I will not need "phase 2". Obviously Audi
> recognizes this problem.

107.    On May 8, 2015, a class vehicle driver reported the following incident

on an online forum:[36]

> I bought my Audi back in June of 2012. A month later

---

[34]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[35]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[36]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

I drove to a town about 1 hour away, on the highway. On the way there the oil light came on. I talked to the mechanic at the dealership about this and he told me it is normal for Audi to consume oil and to just come in when ever the car needs more oil. Every single time I drive on the highway for a total of about 2 hours I will need to add a quart of oil. My boyfriend recently moved to the opposite side of town and so now I drive about 10mn on the highway a few times a week. This has caused me to have to add oil once a month.

108.    On July 19, 2015, a class vehicle driver reported the following

incident on an online forum:[37]

I bought a CPO Q5 2012 in October 2014. I have not been driving the car that much in the first year, but this year (2015) it is basically my primary commute car. in 2014, the "low oil" yellow light came on a few month after I got the car, and I took it for service. It went on again a few month after the service, and the dealer top it off for free. Looking at the oil level, it seems like it is half way down already. So with record of burning a quarts of oil per 1000 mile, I started searching around and I learned about the issue and the class action. I confirmed that based on my engine serial number, it is one of the problematic ones subject to class lawsuit.

109.    On April 25, 2015, a class vehicle driver reported the following

incident on an online forum:[38]

Purchased a CPO Audi A4 in Syracuse back in October, oil light has continued to come on every 2k to 3k miles. Dealership has done 3 oil consumption test and continue to say to drive the car and fi the light comes back on and call us. I've called Audi Headquarters to make them aware of the issue, they have called Driver's Village to schedule another oil consumption test and

---

[37]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[38]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

> have also said there is no recall on my 2013 A4 because the recall ended for 2012. I wish I would have known that Audi did not correct this issue because I would have went with Lexus or Mercedes instead.

110.   On November 23, 2015, a class vehicle driver reported the following incident on an online forum:[39]

> I'm not sure Audi will ever have a solution to this problem. I have a 2013 Audi A4 2.0T with 60,000Km and it uses one liter / 800 Km's (497 miles)!

111.   On April 24, 2016, a class vehicle driver reported the following incident on an online forum:[40]

> I purchased a New Q5 in 2012 but notice that the 2.0 Turbo engine was manufactured in August of 2011. It had the standard 4/50,000 warranty. I am 2000 miles outside of the warranty, with 52,000 on the vehicle… and the engine lost it's oil in a matter of hours and my engine has seized. Used engine will be $4900, with another $1300 in labor to install.

112.   On March 7, 2017, a class vehicle driver reported the following incident on an online forum:[41]

> I purchased my Audi A4 private in August 2016. Currently my car has 109,000 miles. I drive within a 10 mile radius every other day or so. I must always put a quart of oil in every two weeks like clock work. Is there anything I can do to get Audi to do anything at all? An Audi dealership in Ohio told me that I would have to pay $8,000 to replace the pistons in the engine to fix the

---

[39]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[40]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[41]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

consumption issue.

113.   On March 29, 2019, a class vehicle driver reported the following

incident on an online forum:[42]

> Vehicle has 70 000 km (45 000 miles). Original customer complaint was check engine light on. Engine code was P0303. When vehicle was brought it was not missing and we road tested and could not make it miss. We moved the ignition coils and plugs and sent vehicle back out with customer.
>
> A few days later check engine light returned and vehicle was running rough. Code was P0303 again but now the compression on cylinder three was close to nothing and leakage was through to crankcase. Further diagnosis resulted in disassembly of the engine to find a piston with broken ring lands. The top of the piston looks perfect. I am not sure the cause of the piston failure.

114.   On January 1, 2016, a class vehicle driver reported the following

incident on an online forum:[43]

> Bought this car second hand in 2016. Noticed the oil light in the 1st week but just thought it needed a top up. Since then a quart of oil is needed every 300 km! There is no leak and I don't know where the oil is going. A full gas tank will take me 600km so that two quarts of oil for every tank of gas!! Coming from cars which have never needed additional oil between service, this is shocking and for such a brand name car, highly unacceptable. I will check with the dealers this week to see if there as a fix as my research now shows me the problem is well known. Unacceptable for a modern car!

---

[42]https://diag.net/msg/m584321f5dvhwmgaq3dx15089t

[43]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

115.   On April 1, 2017, a class vehicle driver reported the following

incident on an online forum:[44]

> I bought a 2012 Audi Q5 in in 2015. It was a certified
> pre-owned Audi straight from the dealer with 39,000
> miles on it. For the first 20,000 miles of owning this
> car, it was all I had hoped for. Then, the check engine
> and oil light game started. At first, adding oil meant that
> it would it go another 1500-2000 miles without issue.
> Then, around 75k, it went to 500 to 750 miles. Once it
> hit 95k, it dropped to every 400 to 600 miles that it
> needed oil. I am at 100k and desperately want to dump
> this lemon. Unfortunately, I have another 16 payments
> on this garbage car. I've spoken with a local mechanic
> about it and he says the fix is replacing the pistons etc,
> basically, a $9k job to fix it.

116.   On November 17, 2015, a class vehicle driver reported the following

incident on an online forum:[45]

> I purchased my Q5 from a NY Audi dealer in March of
> 2012, my car was built February 2012.
> Approximately, 2 1/2 years ago, my cars minimum oil
> light went on 1,000 miles short of its next oil change,
> which had never happened before. I called the
> dealership, I was told "this was to be expected, was just
> the way these cars aged". I added the recommended
> 5W40 European synthetic oil. This continued, in
> increasing intervals.
> I repeatedly asked the dealership about this and was
> told again and again this was fine and to keep adding
> oil. This car was only every serviced at Audi
> dealerships and has primarily highway miles. Last
> December, the dealership began only dealing in VW.
> So in the spring when I needed tail light and hvac fan
> work I went to the Audi dealer in Albany/Latham. They

---

[44]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

[45]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

> completed $1500. worth of work. I asked again about the oil, at that point I was adding a quart every 500 miles. I was told there was a known problem w/this causing early piston failure but that it was with the 2009-2011 models and to fix it would cost approximately $6000.! And, you guessed it, was told to keep adding oil!!!!

117.    On May 5, 2017, a class vehicle driver reported the following incident on an online forum:[46]

> Audi wasted my time and money proving my car failed oil consumption test. I was sent on wild goose chase for receipts, knowing they would not fix my car. For 1 person at Audi, having all power to grant you Good Will.. to fix your car. I can't believe Audi won't support their product and fix these cars. Problem obviously not solved.

118.    On February 1, 2016, a class vehicle driver reported the following incident on an online forum:[47]

> The car has been burning extra oil for about 5 months. I have brought it to the dealership twice and they say there are no issues. It is now using an extra quart of oil every 500 miles or 10 days or so. This is truly excessive and I know from this site that Audi has already settled a class action suit for the same issue with other models.

119.    On November 30, 2015, a class vehicle driver reported the following

---

[46]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

[47]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

incident on an online forum:[48]

> The Purchased the car new from the dealer. It has always consumed oil but late last year the oil consumption jumped. It currently has 90K miles and is using about a quart every 500 miles. Audi has a class action lawsuit settlement but is claiming our car is just out of the extended warranty and because we had it serviced outside of the dealership for a period of time, they prefer to spend their money fixing cars that they maintained (made money on).

> Spent a bunch of money to purchase this car and now they say its needs a 8K fix, total junk. Audi's lack of customer service, poor product quality and their larger corporate dishonesty (VW fraud) is disgusting.

120. On May 16, 2016, a class vehicle driver reported the following

incident on an online forum:

> I noticed an excessive oil consumption over a year ago but the dealer led me to believe no one else had this issue. Over the past few months the issue seems to get worst - 1/2 quart every 2000 miles. I called the dealer but they told me I would have to pay for the repairs although Audi knows of the issue. Called Audi Customer Service and after checking my VIN they told me the same, although it is well known the problem was fixed mid year of that model year. I was about to purchase another Audi later this year but it would seem it would be a poor decision on my part: love the product but hate the fact Audi does not stand behind their product on a known issue

121. On February 28, 2017, 2017, a class vehicle driver reported the

---

[48]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

following incident on an online forum:[49]

> The dealer recommended piston replacement... just like all the previous model years subject to the lawsuit. We are burning 1.13 quarts every thousand miles. The cost of rthe epair is $6,000.00. The regional network is willing to cover $2K for parts, but no labor.

122.   On May 22, 2017, a class vehicle driver reported the following incident on an online forum:[50]

> Audi A4 2012 excessive oil consumption. Dealer did the oil consumption test and piston and rings need to be replaced. Already spent over $1K on new breather crankshaft repairs etc. Did anyone get AoA to pay for new piston and rings? Its a $6K repair that I am unwilling to pay because it should not be doing this crap for such an expensive car.

123.   On May 31, 2017, a class vehicle driver reported the following incident on an online forum:[51]

> My 2013 A4 (purchased in June 2012) had major oil consumption problem. Battled with the dealer and Audi. Failed oil consumption test but Audi was not going to repair under warranty. By now my vehicle had 115000km -problem was gradually getting worse. Filed a CAMVAP claim (Canadian Dealer Arbitration). Now Audi and dealer changed their minds. Car was in recently for piston replacement under "goodwill warranty".

---

[49]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

[50]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

[51]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

124.   On July 18, 2017, a class vehicle driver reported the following incident on an online forum:[52]

> We just bought a used 2012 Audi A4 (115k mileage) and just discovered it has this cursed problem. It burns a quart in 200 miles... that is not a typo... every 200 miles we now have to top it off.

125.   On July 18, 2017, a class vehicle driver reported the following incident on an online forum:[53]

> We just bought a used 2012 Audi A4 (115k mileage) and just discovered it has this cursed problem. It burns a quart in 200 miles... that is not a typo... every 200 miles we now have to top it off.

126.   As discussed above, VW issued a Technical Service Bulletin to address the piston issues in its 2.0T engines.  On October 16, 2013, VW issued a TSB entitled "Engine oil consumption too high." In the TSB, which applied to the 2.0T-equipped Audi A4, A5, and Q5 of various model years between 2009 and 2011, VW admitted that its customers were complaining of "excessive engine oil consumption," and directed its dealerships to replace the 2.0T engine's crankcase pressure regulating valve and front crankshaft seal in response. A copy of this TSB

---

[52]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

[53]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

is attached as Exhibit 1.

127.   On September 5, 2013, VW issued a revised TSB for all of its
vehicles, adding the model years 2012 through 2014.  This TSB cautioned dealer
technicians to clean "metal debris resulting from the mechanical problem" out of
the intake manifold and other areas when installing a replacement engine.
Notably, the TSB stated that "[e]ngine damage caused by failure to clean debris
from assemblies that are transferred to a replacement engine is not covered by
Warranty." A copy of this TSB is attached as Exhibit 2.

128.   A significant portion of VW's technical instructions to dealerships are
only available on propriety VW software and systems.  Dealership technicians are
instructed by VWGoA-given trainings how to use this software, which provides
guided, step-by-step instructions on diagnosing, repairing, and communicating
with consumers about problems with their vehicles.  Technicians at Audi
authorized dealerships are also routinely instructed to open TAC cases with
VWGoA regarding certain repairs and to follow the instructions given by
VWGoA.  As a result, discovery will show that that VWGoA has hundreds, if not
thousands of TAC cases in its records showing consumer and dealer complaints
about piston ring and/or piston failure, and that VWGoA has instructed dealerships
to replace the piston rings, the pistons, and even the engine block itself as a result
of those failures.

129.   The existence of the Piston Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiff and other Class Members known of the Piston Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

130.   Reasonable consumers, like Plaintiff, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety risk, and is free from defects. Plaintiff and Class Members further reasonably expect that VW will not sell or lease vehicles with known safety defects, such as the Piston Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect VW to conceal and fail to disclose the Piston Defect to them, and to then continually deny its existence.

**VW Has Actively Concealed the Piston Defect**

131.   Despite its knowledge of the Piston Defect in the Class Vehicles, VW actively concealed the existence and nature of the defect from Plaintiff and Class Members. Specifically, VW failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a.   any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the pistons within the 2.0T Engine;

51

b.  that the Class Vehicles, including the pistons, were not in good in working order, were defective, and were not fit for their intended purposes; and

c.  that the Class Vehicles and the pistons were defective, despite the fact that VW learned of such defects as early as early 2012.

132.  When consumers present their Class Vehicles to an authorized VW dealer for piston related repairs, rather than repair the problem under warranty, VW dealers choose to inform consumers that their vehicles are functioning properly, conduct repairs that merely mask the Piston Defect, or fail to provide service stating that such damage is not covered under warranty.  In this manner, VW avoids paying for warranty repairs and unlawfully transfers the cost of the Piston Defect to Plaintiff and other consumers.

133.  In particular, VW has periodically issued other communications to its dealerships reminding them that the two-step oil consumption test is necessary even when a customer comes in with proof of oil consumption.  VW reminds its technicians to tell consumers, "all internal combustion engines consume a certain amount of oil," and certain vehicles "consume more oil during the break-in period."

134.  However, some technicians do acknowledge that the Piston Defect exists, as experienced by Plaintiff.  They say it is a "known defect."  Despite this,

VW has not issued any communications to Class Members acknowledging the Piston Defect, continuing to allow vehicles with a known safety risk to remain on the road.

135.   Further, rather than issue a TSB that specifically addresses the failures of the piston rings and/or pistons, a copy of which VW is required to file with NHTSA, VW has instead kept information regarding the Piston Defect in its proprietary Offboard Diagnostic Information System ("ODIS").  ODIS, as well as other proprietary software, provides dealership technicians with guided, step-by-step instructions on diagnosis and repair.  These systems contain information about the Piston Defect, or otherwise inform technicians to contact VWGoA directly via TAC cases, at which time VWGoA informs technicians to check for piston failure and resultant engine damage, and if found, replace the pistons and/or the engine blocks.  ODIS and the other proprietary systems are not accessible to Plaintiff or the general public.  Moreover, when consumers call VWGoA's customer service hotline directly, VWGoA's response is only to direct them to take their vehicles to an authorized dealership for diagnosis.

136.   VW has caused Class Members to expend money at its dealerships to diagnose, repair or replace the Class Vehicles' pistons and/or related components, despite VW's knowledge of the Piston Defect.

**The Agency Relationship between Volkswagen Group of America, Inc. d/b/a Audi of America and its Network of Authorized Dealerships**

137.   In order to sell vehicles to the general public, VWGoA enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new, VW or Audi-branded vehicles, the authorized dealerships are also permitted under these agreements with VWGoA to service and repair these vehicles under the warranties VWGoA provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, VWGoA's authorized dealerships are VWGoA's agents, and the consumers who purchase or lease VWGoA vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their VWGoA vehicles locally. Because Plaintiff and members of the Class are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

138.   Further, Plaintiff and each of the members of the Class are the intended beneficiaries of VWGoA's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by VWGoA. VWGoA's warranties were designed for and intended to benefit the consumers only. The

consumers are the true intended beneficiaries of VWGoA's express and implied

warranties, and the consumers may therefore avail themselves of those warranties.

139.   VWGoA issued the express warranty to the Plaintiff and the Class

members. VWGoA also developed and disseminated the owner's manual and

warranty booklets, advertisements, and other promotional materials relating to the

Class Vehicles. VWGoA also is responsible for the content of the Monroney

Stickers on Audi-branded vehicles. Because VWGoA issues the express warranty

directly to the consumers, the consumers are in direct privity with VWGoA with

respect to the warranties.

140.   In promoting, selling, and repairing its defective vehicles, VWGoA

acts through numerous authorized dealers who act, and represent themselves to the

public, as exclusive VWGoA representatives and agents. That the dealers act as

VWGoA's agents is demonstrated by the following facts:

a.   The authorized Audi dealerships complete all service and repair

according to VWGoA's instructions, which VWGoA issues to its

authorized dealerships through service manuals, technical service

bulletins ("TSBs"), technical tips ("TT"), and other documents;

b.   Technicians at Audi dealerships are required to go to at least yearly

VWGoA-given trainings in order to remain certified to work on Audi-

branded vehicles, at which they receive training on VW-proprietary

systems such as the ODIS which provides guided, step-by-step instructions on diagnosing and repairing Audi-branded vehicles;

c.  Consumers are able to receive services under VWGoA's issued New Vehicle Limited Warranty only at VWGoA's authorized dealerships, and they are able to receive these services because of the agreements between VWGoA and the authorized dealers. These agreements provide VWGoA with a significant amount of control over the actions of the authorized dealerships;

d.  The warranties provided by VWGoA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

e.  VWGoA dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

f.  VWGoA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, particularly through directed step-by-step ODIS instructions, and the dealerships are able to perform repairs under warranty only with VWGoA's authorization.

g.  VWGoA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises

substantial control over the operations of its dealers and the dealers'

interaction with the public, particularly the advertising; and

h.   VWGoA implemented its express and implied warranties as they

relate to the defects alleged herein by instructing authorized VWGoA

dealerships to address complaints of the Defect by prescribing and

implementing the relevant TSBs cited herein.

141.   Indeed, VWGoA's warranty booklets make it abundantly clear that

VWGoA's authorized dealerships are its agents for vehicle sales and service. The

booklets, which are plainly written for the consumers, not the dealerships, tell the

consumers repeatedly to seek repairs and assistance at their "authorized Audi

dealer." For example, the warranty booklets state, "[a]ny authorized Audi

dealership in the United States, including its territories, will honor this warranty."

Further, the warranty "only applies to vehicles or parts and accessories that are

imported or distributed by Audi, and vehicles original sold by an authorized Audi

dealer in the United States, including its territories." Under the terms of the

warranty repairs will be provided by "[y]our Audi dealer." The booklets direct

Plaintiff and Class members, should they have a problem or concern, to "discuss

them first with management personnel at your authorized Audi dealership. In the

event your dealership does not respond to your satisfaction, Audi offers additional

assistance. You may contact the Audi Customer Experience Center via telephone

or mail as well as email, chat, Twitter, and Facebook…A Customer Advocate, in conjunction with authorized Audi dealer, will work with you to gather and review all the facts relating to your concern."

142.   Further, VWGoA d/b/a Audi of America also offers certain "complimentary services," including a pre-delivery inspection and the first maintenance on the vehicle free of charge.  Both of these services are actually completed by "your authorized dealer."  For example, "[p]rior to delivery, your authorized Audi dealer completed an extensive and detailed inspection of your vehicle."  Further, consumers are directed to "contact your authorized Audi dealer to schedule" their complimentary first service.

143.   Further, as noted by VWGoA on its website describing the Audi Certified Pre-Owned program, the vehicles are actually inspected and certified by technicians at authorized dealerships.  In touting its "300+ Point Dealer Inspection," VWGoA states, "[o]nly once the vehicle passes a detailed dealer inspection does it earn the right to be part of the Audi Certified pre-owned program."[54] As such, authorized Audi dealerships inspect used vehicles on VWGoA's behalf and it is dealer's certification of quality of these vehicles is sufficient under standards published by VWGoA that is enough to bind VWGoA to

---

[54] *See* https://www.audiusa.com/us/web/en/shopping-tools/certified-pre-owned.html (last visited July 15, 2021).

the more generous warranty terms of the Certified Pre-Owned Warranty. As stated on the website, "only after this exhaustive dealer inspection are we confident in backing the vehicle with our Audi Certified pre-owned Limited Warranty."[55] Moreover, the website also states that such vehicles are "rigorously inspected by Audi trained technicians to ensure each Audi Certified pre-owned vehicle is in optimal condition."[56]

144.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of VWGoA. Plaintiff and each of the members of the Class have had sufficient direct dealings with either VWGoA or its agent dealerships to establish privity of contract between VWGoA, on one hand, and Plaintiff and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiff and VWGoA.

## TOLLING OF THE STATUTE OF LIMITATIONS

145.   Any applicable statute(s) of limitations have been tolled by VW's knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class could not have reasonably discover the true, latent nature of the Piston Defect until shortly before this action was commenced.

146.   In addition, even after Class Members contacted Defendant VWGoA

---

[55] *Id*.

[56] *Id*.

and/or its authorized agent dealerships for vehicle repairs within the statute of limitations for repairs concerning the Piston Defect and its symptoms, they were routinely told that the Class Vehicles were not defective, that oil consumption was normal, and/or given illusory repairs.

147.   Defendants were and remain under a continuing duty to disclose Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles because they had superior knowledge of the Piston Defect and its associated safety risk, provided partial disclosures about the functionality and ability of the Class Vehicles to provide safe, reliable transportation, and the facts about the Piston Defect were not reasonably discoverable by Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

148.   Plaintiff brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class pursuant to Rule 4:32. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

149.   The Class is defined as:

> **Class**:  All individuals in New Jersey who purchased or leased any 2012-2017 Audi vehicle equipped with the 2.0-liter turbocharged engines "Class Vehicles."

150.   Excluded from the Class are:  (1) Defendants, any entity or division in

which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

151.   **Numerosity**:  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is easily in the multiple thousands and thus significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

152.   **Typicality**:  Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by VW. The representative Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that they have

incurred or will incur the cost of repairing or replacing the defective piston rings and/or pistons, as well as other engine components damaged by the defective parts. Repairs for the Piston Defect average between $3,000 and $14,000. Furthermore, the factual bases of VW's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

153. **Commonality**: There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

a. Whether Class Vehicles suffer from defects relating to the pistons within the 2.0T Engine;

b. Whether the defects relating to the pistons in the 2.0T Engines constitute an unreasonable safety risk;

c. Whether Defendants knew about the defects pertaining to the Pistons in the 2.0T Engines and, if so, how long Defendants have known of the defect;

d. Whether the defective nature of the pistons constitutes a material fact;

e. Whether Defendants have had an ongoing duty to disclose the defective nature of the pistons in the 2.0T Engine to Plaintiff and Class Members;

f.  Whether Plaintiff and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

g.  Whether Defendants knew or reasonably should have known of the defects pertaining to the pistons within the 2.0T Engine before it sold and leased Class Vehicles to Class Members;

h.  Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective pistons within the 2.0T Engine and/or its components;

i.  Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective pistons and/or its components;

j.  Whether VWGoA breached its express warranties under UCC section 2301;

k.  Whether VWGoA breached its express warranty under the laws of New Jersey;

l.  Whether Defendants breached their implied warranties under the laws of New Jersey;

m. Whether Defendants violated the New Jersey Consumer Fraud Act,

N.J.S.A. §§ 56:8-1, *et seq*.; and

n.  Whether Defendants violated the New Jersey Truth-in-Consumer,

Contract, Warranty and Notice Act, N.J.S.A. §§ 56:12-14, *et seq.*

154.  <u>Adequate Representation</u>:  Plaintiff will fairly and adequately protect

the interests of the Class Members. Plaintiff has retained attorneys experienced in

the prosecution of class actions, including consumer and product defect class

actions, and Plaintiff intends to vigorously prosecute this action.

155.  <u>Predominance and Superiority</u>:  Plaintiff and Class Members have all

suffered, and will continue to suffer, harm and damages as a result of Defendants'

unlawful and wrongful conduct. A class action is superior to other available

methods for the fair and efficient adjudication of the controversy. Absent a class

action, most Class Members would likely find the cost of litigating their claims

prohibitively high and would therefore have no effective remedy. Because of the

relatively small size of the individual Class Members' claims, it is likely that only

a few Class Members could afford to seek legal redress for Defendants'

misconduct. Absent a class action, Class Members will continue to incur damages,

and Defendants' misconduct will continue unabated without remedy or relief.

Class treatment of common questions of law and fact would also be a superior

method to multiple individual actions or piecemeal litigation in that it will

conserve the resources of the courts and the litigants and promote consistency and

efficiency of adjudication.

### FIRST CAUSE OF ACTION
**(Violations of the New Jersey Consumer Fraud Act,
N.J.S.A. §§ 56:8-1, *et seq.*)
(On Behalf of the Class against all Defendants)**

156.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-147 of this Complaint.

157.   Plaintiff brings this cause of action individually and on behalf of the Class against all Defendants.

158.   VW, Plaintiff, and Class Members are "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J.S.A. § 56:8-1(d).

159.   VW engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (d).

160.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J.S.A. § 56:8-2. VW engaged in unfair and deceptive practices that violated the New Jersey CFA as described above.

161.   VW participated in and engaged in deceptive business or trade

practices prohibited by the New Jersey CFA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

162.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Plaintiff and the Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

163.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

164.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

165.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

166.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

167.   VW knew or should have known that its conduct violated the New Jersey CFA.

168.   Plaintiff and the Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

169.   Had Plaintiff and the Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of VW's misconduct.

170.   VW owed Plaintiff and the Class Members a duty to disclose the truth about the Piston Defect because VW:

a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

b.   intentionally concealed the foregoing from Plaintiff and the Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff and the Class Members that contradicted these representations.

171.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Plaintiff and the Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

172.   Having volunteered to provide information to Plaintiff and the Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Class Members.

173.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Plaintiff and the Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

174.   Plaintiff and the Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Plaintiff and the Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

175.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Plaintiff and the Class Members suffered and will continue to suffer injury in fact and/or actual damages.

176.   Defendant's violations present a continuing risk to Plaintiff and the Class Members as well as to the general public. Defendant's unlawful acts and

practices complained of herein affect the public interest.

177.   As a proximate and direct result of VW's unfair and deceptive trade practices, Plaintiff and members of the Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

178.   Plaintiff and members of the Class seek monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

179.   Plaintiff and the Class Members Pursuant to N.J.S.A. § 56:8-19, New Jersey Plaintiff and the Class Members seek an order enjoining VW's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

**SECOND CAUSE OF ACTION**
**(Violations of the New Jersey Truth-in-Consumer,**
**Contract, Warranty and Notice Act,**
**N.J.S.A. §§ 56:12-14, *et seq.*)**
**(On Behalf of the Class against all Defendants)**

180.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-147 of this Complaint.

181.   Plaintiff brings this cause of action individually and on behalf of the

Class against all Defendants.

182.   Plaintiff and Class Members are "consumers" within the meaning of N.J.S.A. 56:12-15.

183.   Plaintiff and Class Members purchased or leased their Class Vehicles primarily for personal, family, or household purposes.

184.   VW is a seller within the meaning of N.J.S.A. 56:12-15 and -17.

185.   The New Jersey Truth-in-Consumer, Contract, Warranty and Notice Act ("TCCWNA"), provides in relevant part that "no seller, creditor, lender or bailee may offer or enter into any written consumer contract or give or display any notice which includes any provision that violates a clearly established right of the consumer or responsibility of the seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed."  N.J.S.A. 56:12-15.

186.   VW violated the TCCWNA by violating the NJ CFA and a clearly established legal right of a consumer and/or responsibility of the seller to not engage in any misrepresentations, deception, or unconscionable commercial conduct in connection with consumer sales as detailed herein.

187.   As the result of VW's violations of the TCCWNA, Plaintiff and the Class Members are entitled to statutory damages of not less than $100 each, as well

as reasonable attorneys' fees and court costs, as provided by N.J.S.A. 56:12-17.

**firstTHIRD CAUSE OF ACTION**
**Breach of Express Warranty**
**(N.J.S.A. §§ 12A:2-313 and 2A-210)**
**(On behalf of the Class against VWGoA)**

188.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-147 of this Complaint.

189.   Plaintiff brings this cause of action individually and on behalf of the Class against VWGoA.

190.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under N.J.S.A. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

191.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under N.J.S.A.§ 12A:2A-103(1)(p).

192.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S.A.§§ 12A:2-105(1) and 2A-103(1)(h).

193.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under New Jersey law.

194.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

195.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

196.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

197.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components. By simply replacing Plaintiff's and Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

198.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Plaintiff and the Class Members. Among other things, Plaintiff and the Class Members had no meaningful choice in

determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

199.   Plaintiff and the Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

200.   Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

201.   Plaintiff was not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources.  Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

202.   In addition, via letter dated July 23, 2021, Plaintiff gave notice to Defendants, that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

203.   As a direct and proximate cause of the breach of express warranty by VWGoA, Plaintiff and the other Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

204.   Plaintiff and the other Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### secondFOURTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(N.J.S.A. §§ 12A:2-314 and 2A-212)**
**(On behalf of the Class against all Defendants)**

205.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-147 of this Complaint.

206.   Plaintiff brings this cause of action individually and on behalf of the Class against all Defendants.

207.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under N.J.S.A. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

208.   With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under N.J.S.A.§ 12A:2A-103(1)(p).

209.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S.A.§§ 12A:2-105(1) and 2A-103(1)(h).

210.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J.S.A. §§ 12A:2-314 and 2A-212

211.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Plaintiff and the Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff and the Class Members, with no modification to the defective engines.

212.   VW provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

213.   VW impliedly warranted that the Class Vehicles were of

merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

214.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

215.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

216.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Plaintiff and Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

217.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in

violation of N.J.S.A. §§ 12A:2-314 and 2A-212.

218.   Plaintiff and the Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

219.   Plaintiff and the Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

220.   In addition, via letter dated July 23, 2021, Plaintiff gave notice to Defendants, that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

221.   Because Plaintiff purchased his vehicle from an authorized VW dealer, he is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

222.   As a direct and proximate cause of VW's breach, Plaintiff and the

Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff and the Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

223.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Plaintiff and the Class Members have been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Fraud by Concealment/Fraud in the Inducement)**
**(On Behalf of the Class, against all Defendants)**

224.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-147 of this Complaint.

225.   Plaintiff brings this cause of action individually and on behalf of the Class.

226.   VW concealed and suppressed material facts concerning the quality of the Class Vehicles, and the 2.0T Engines VW installed in Class Vehicles.

227.   VW concealed, suppressed, and omitted material facts concerning the serious Piston Defect causing the pistons and the engine to consumer excessive oil and fail at any time. Discovery will show that the Piston Defect is in the design, manufacture, and/or workmanship of the piston rings and/or pistons/piston heads such that the piston rings do not seat properly in the grooves of the piston head.

VW knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Piston Defect prior to purchasing or leasing the Vehicles. VW further failed to disclose and/or denied the existence the Defect when Plaintiff and Class Members complained of the failure of their 2.0T Engines.

228.   VW did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of VW vehicles that the Class Vehicles were world-class, safe, warranted, and reliable vehicles, and concealed the information in order to prevent harm to VW and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

229.   These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiff's and Class Members' decisions to purchase or lease the Class Vehicles.

230.   VW had a duty to disclose the Piston Defect in the Class Vehicles because it was known and/or accessible only to VW; VW had superior knowledge and access to the facts; and VW knew the facts were not known to or reasonably discoverable by Plaintiff and Class Members.

231.   VW also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the

Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the actual quality, comfort, and usability of Class Vehicles.

232.   Even when faced with complaints regarding the Defect, VW misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the 2.0T Engine failure was complained of to VW.

233.   The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiff and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

234.   VW actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiff and Class Members.

235.   Discovery will show that VW has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding defects that exist in VW vehicles.

236.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiff's and Class Members' actions were justified. VW was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

237.   Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the Piston Defect that VW failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

238.   Accordingly, VW is liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

239.   VW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff' and Class Members' rights and well-being to enrich VW. VW's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SIXTH CAUSE OF ACTION
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*)
### (On Behalf of the Class, against all Defendants)

240.    Plaintiff incorporates by reference the allegations contained in paragraphs 1-147 of this Complaint.

241.    Plaintiff brings this cause of action individually and on behalf of the Class.

242.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

243.    Plaintiff and the Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

244.    VW is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

245.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

246.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

247.    In its Limited Warranty, VW expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.

248.    VW's Limited Warranty is a written warranty within the meaning of

the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles'
implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

249.   With respect to Class members' purchases or leases of the Class
Vehicles, the terms of VW's written warranty and implied warranty became part of
the basis of the bargain between VW, on the one hand, and Plaintiff and each of
the members of the proposed Class, on the other.

250.   VW breached the implied warranty of merchantability. Without
limitation, the Class Vehicles have piston rings that do not seat properly in the
grooves of the piston head in the 2.0T Engine, which can cause the pistons and the
engine itself to fail at any time,, as described above, and which thus render the
Class Vehicles unmerchantable.

251.   VW breached its express Limited Warranty by selling and leasing
Class Vehicles with 2.0T Engine that were defective, requiring repair or
replacement within the warranty period, and refusing to honor the express warranty
by repairing or replacing, free of charge, the 2.0T Engine and its component parts,
and instead, replacing the defective 2.0T Engine and its components with equally
defective 2.0T Engines and components.

252.   Plaintiff Gonzalez, individually and on behalf of the members of the
proposed Class, notified VW of the Piston Defect in the Class Vehicles, and its
corresponding breach of warranty, through a notice letter dated and mailed July 23,

2021.

253.    Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer. VW was also provided notice of the defect through thousands of consumer complaints and information about service repairs from its dealerships. VW has not remedied the breach.

254.    Further, VW has refused to provide an adequate warranty repair for the Piston Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to the Piston Defect VW dealers either, informed them that their vehicles are functioning properly, conduct repairs that merely mask the Piston Defect, or fail to provide service stating that such damage is not covered under warranty.

255.    At the time of sale or lease of each Class Vehicle, VW knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Piston Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff and the members of the proposed Classes and Subclasses resort to an informal dispute resolution procedure and/or afford VW a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

256.    The amount in controversy of Plaintiff's individual claims meet or

exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

257.   As a direct and proximate result of VW's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiff and the members of the proposed Class have sustained damages in an amount to be determined at trial.

258.   Plaintiff, individually and on behalf of all members of the proposed Class, seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

## RELIEF REQUESTED

259.   Plaintiff, on behalf of herself and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

   a.   An order certifying the proposed Class, designating Plaintiff as named representatives of the Class, and designating the undersigned as Class Counsel;

   b.   A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the 2.0T Engine, including the need for periodic maintenance;

   c.   An order enjoining Defendants from further deceptive distribution,

sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to remove, repair, and/or replace the Class Vehicles' defective 2.0T Engine and/or its components with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

d. A declaration requiring Defendants to comply with the various provisions of the Song-Beverly Act alleged herein and to make all the required disclosures;

e. An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

f. Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

g. A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or

lease of its Class Vehicles or make full restitution to Plaintiff and

Class Members;

h.  An award of attorneys' fees and costs, as allowed by law;

i.  An award of pre-judgment and post-judgment interest, as provided by

law;

j.  Leave to amend the Complaint to conform to the evidence produced at

trial; and

k.  Such other relief as may be appropriate under the circumstances.

## CERTIFICATION OF NO OTHER ACTIONS

Pursuant to <u>Rule</u> 4:5-1, the undersigned certifies that to the best of his knowledge, the within matters in controversy are not the subject of any other action pending in any other court or of a pending arbitration proceeding, nor is any action or arbitration proceeding contemplated, nor are other parties required to be joined in this action. There is a case in New Jersey Federal District Court that asserts claims for the same defect in the same vehicles against the same defendant: *Rieger v. Volkswagen Group of America, Inc.*, 1:21-cv-10546-NLH-MJS. However, Plaintiff Gonzalez is not a party to that action, there is no New Jersey plaintiff in that action and there are no claims in that action based on New Jersey state law.

## CERTIFICATION PURSUANT TO RULE 1:38-7(c)

Pursuant to <u>Rule</u> 1:38-7(c), the undersigned certifies that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with <u>Rule</u> 1:38 7(b).

## DESIGNATION OF TRIAL COUNSEL

Pursuant to <u>Rules</u> 4:5-1(c) and 4:25-4, Russell D. Paul is hereby designated as trial counsel.

## DEMAND FOR JURY TRIAL

The Plaintiff demands trial by a jury on all of the triable issues of this

complaint, pursuant to <u>Rules</u> 1:8-2(b) and 4:35-1(a).

WHEREFORE, Plaintiff requests judgment against Defendants for damages, together with attorney's fees, if applicable, costs of suit, and any other relief as the court may deem proper

Dated: August 5, 2021             Respectfully Submitted,

/s/ Russell D. Paul
Russell D. Paul (NJ Bar. No. 037411989)
Amey J. Park (NJ Bar. No. 070422014)
Abigail J. Gertner (NJ Bar. No. 019632003)
Natalie Lesser (NJ Bar. No. 017882010)
**BERGER MONTAGUE PC**
1818 Market Street
Suite 3600
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net

Tarek H. Zohdy (*pro hac vice forthcoming*)
Cody R. Padgett (*pro hac vice forthcoming*)
**CAPSTONE LAW APC**
1875 Century Park East
Suite 1000
Los Angeles, California 90067
Tel: (310) 556-4811
Fax: (310) 943-0396
tarek.zohdy@capstonelawyers.com
cody.padgett@capstonelaywers.com

Ramzy P. Ladah (SBN 271039*)*
Adrian A. Karimi (*pro hac forthcoming)*
**LADAH LAW FIRM**
517 S. 3rd St
Las Vegas, NV  89101

Telephone:  (702) 252-0055
Facsimile:   (702) 248-0055
Ramzy@ladahlaw.com
Adrian@ladahlaw.com

*Attorneys for Plaintiff and the Proposed
Class and Subclasses*

# Exhibit 1

# Technical Service Bulletin



**17 Engine oil consumption too high, 2.0L TFSI (EA888) Model Year 2009 - 2011**

17 13 43 2027731/5 October 16, 2013. Supersedes Technical Service Bulletin Group 17 number 13-42 dated October 10, 2013 for reasons listed below.

| Model(s) | Year | VIN Range | Vehicle-Specific Equipment |
|---|---|---|---|
| A4 | 2009 - 2011 | All | 2.0L TFSI |
| A5 | 2010 - 2011 | | |
| A5 Cab | 2010 - 2011 | | |
| Q5 | 2011 | | |

## Condition

| REVISION HISTORY | | |
|---|---|---|
| **Revision** | **Date** | **Purpose** |
| 5 | - | Revised *Warranty* (Updated Labor Operations) |
| 4 | 10/10/2013 | Revised header data (Added customer code for Elsa display) |
| 3 | 3/20/2012 | Revised *Service* (Updated Figure 1) |
| 2 | 11/11/2011 | Revised header data |
| 1 | 11/2/2011 | Original publication |

Based on customer complaint, follow the procedure below.

## Technical Background

In order to provide effective lubrication and cooling of internal engine components, all internal combustion engines consume a certain amount of engine oil. Oil consumption varies from engine to engine and may change significantly over the life of the engine. Typically, engines with specified break-in periods consume more oil during the break-in period, and the oil consumption will stabilize after the break-in period. Refer to the *Owner's Manual* for specific break-in procedures.

Under normal conditions, the rate of oil consumption depends on the quality and viscosity of the oil, the RPM at which the engine is operated, the ambient temperature and road conditions. Additional factors are the amount of oil dilution from water condensation or fuel residue and the oxidation level of the oil.

Under certain driving conditions, internal engine pressure conditions in the 2.0 TFSI engine can negatively influence the rate of oil consumption. This condition can occur while the vehicle is operated in metro driving conditions; for example: stop-and-go traffic with extended idle periods.

© 2013 Audi of America, Inc.
All rights reserved. Information contained in this document is based on the latest information available at the time of printing and is subject to the copyright and other intellectual property rights of Audi of America, Inc., its affiliated companies and its licensors. All rights are reserved to make changes at any time without notice. No part of this document may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, nor may these materials be modified or reposted to other sites, without the prior expressed written permission of the publisher.

# Technical Service Bulletin

**Audi**

## Production Solution

Crankcase pressure reduction starting with model year 2012.

## Service

1. Upon *customer complaint* of excessive engine oil consumption, proceed as follows:

   - Replace crankcase pressure regulating valve with part number **06H103495J**.

   - Replace front crankshaft seal with part number **06L103085B**. (Also requires front crankshaft bolt **WHT001760**).

   - Update the Engine Control Module software using SVM action code listed in the table below.

   - Follow all instructions TSB 2011732: *00 Software Version Management (SVM), operating instructions*.

| Model | Engine | Old Software Part Number | Old Software Version | New Software Part Number | New Software Version | SVM Action Code |
|-------|--------|--------------------------|----------------------|--------------------------|----------------------|-----------------|
| 2009 – 2010 A4<br>2010 A5, A5 Cabriolet | CAEB | 8K2907115N<br>8K2907115M<br>8K2907115D<br>8K2907115AA<br>8K2907115AA | 0001<br>0001<br>0001 – 0002<br>0001 – 0003<br>0005 – 0006 | 8K2907115AL | 0001 | 01A037 |
| 2011 A4 | CAEB | 8K2907115AD<br>8K2907115T | All | 8K2907115AG<br>8K2907115AM | 0002<br>0002 | B801A012 |
| 2011 A5 | CAEB | 8K2907115AD | All | 8K2907115AG | 0002 | B801A012 |
| 2011 A5 Cabriolet | CAEB | 8K2907115AD<br>8K2907115T | All | 8K2907115AG<br>8K2907115AM | 0002 | B801A012 |
| 2011 Audi Q5 | CAEB | 8R0907115H | All | 8R0907115P | 0002 | B801A012 |

© 2013 Audi of America, Inc.
All rights reserved. Information contained in this document is based on the latest information available at the time of printing and is subject to the copyright and other intellectual property rights of Audi of America, Inc., its affiliated companies and its licensors. All rights are reserved to make changes at any time without notice. No part of this document may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, nor may these materials be modified or reposted to other sites, without the prior expressed written permission of the publisher.

# Technical Service Bulletin

**Audi**

---

2. **Start oil consumption measurement, Part 1.**

 **Tip:** Ensure the VAS device is at software level *(Base 19 and Brand 19.34)* or higher

 **Tip:** The electronic oil consumption measurement will only function on the 2.0 TFSI engine with engine code **CAEB**.

- **Park vehicle on a level surface, the GFF test plan will *not* continue if vehicle is tilt more than 0.5 degrees *(side to side or front to rear)*.**

- From GFF, select *Function/Component Selection>>>Powertrain>>>CAEB –Engine>>>01-Oil consumption measurement (electronic measurement)*.



| Guided Fault Finding | Audi | V19.38.00 31/01/2012 |
|---|---|---|
| Function / Component Selection | Audi A4 USA/CDN 2009> | |
| | 2009 (9) | |
| Select function or component | Sedan | |
| | CAEB 2.0I TFSI / 155 kW | |

Powertrain (Repair Groups 10 - 39)
CDNB/CAEB/CDNC/CDZA/CAEA/CADA - Engine (RG. 01; 10 - 2...
 17 - Engine - Lubrication
  Subsystems, basic conditions
   + 01 - Oil consumption measurement (electronic measurement)
   * Gas/Diesel in engine oil

**Figure 1.** *01 – Oil consumption measurement (electronic measurement).*

- Follow the GFF test plan, *Start oil consumption measurement* exactly and observe all notes and cautions.

---

**Page 3 of 5**

© 2013 Audi of America, Inc.
All rights reserved. Information contained in this document is based on the latest information available at the time of printing and is subject to the copyright and other intellectual property rights of Audi of America, Inc., its affiliated companies and its licensors. All rights are reserved to make changes at any time without notice. No part of this document may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, nor may these materials be modified or reposted to other sites, without the prior expressed written permission of the publisher.

# Technical Service Bulletin



## Warranty

Only one oil consumption test will be reimbursed under Warranty within the next 25,000 miles (40,000 km).

 **Note:**

Oil measurement plan must be performed independently.  Time for additional tasks performed via GFF should not be included in oil measurement time and is subject to removal.

| Claim Type: | Use applicable claim type. If vehicle is outside any warranty, this Technical Service Bulletin is informational only. | | |
|---|---|---|---|
| **Service Number:** | 1055 | | |
| **Damage Code:** | 0010 | | |
| **Labor Operations:** | Start oil consumption measurement, Part 1 | 1716 0199 | Time on GFF diagnostic log (Max 60 TU) |
| | Pressure regulating valve     remove + install | 1726 1913 | 50 TU |
| | Crankshaft vibration damper  remove + install | 1375 1913 | 90 TU |
| | Crankshaft oil seal, pulley end remove + install | 1374 1963 | 30 TU |
| | SVM software update | 2470 2599 | Time on GFF diagnostic log (Max 40 TU) |
| **Diagnostic Time:** | GFF – Checking and clearing fault codes included in existing labor operations | 0150 0000 No allowance | 0 TU |
| | Road test prior to service procedure | No allowance | 0 TU |
| | Road test after service procedure | 0121 0004 | 10 TU |
| | Technical diagnosis at dealer's discretion (Refer to Section 2.2.1.2 and Audi Warranty Online for DADP allowance details) | | |
| **Claim Comment:** | As per TSB #2027731/5 | | |

All warranty claims submitted for payment must be in accordance with the *Audi Warranty Policies and Procedures Manual*. Claims are subject to review or audit by Audi Warranty.

© 2013 Audi of America, Inc.
All rights reserved.  Information contained in this document is based on the latest information available at the time of printing and is subject to the copyright and other intellectual property rights of Audi of America, Inc., its affiliated companies and its licensors. All rights are reserved to make changes at any time without notice.  No part of this document may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, nor may these materials be modified or reposted to other sites, without the prior expressed written permission of the publisher.

# Technical Service Bulletin



**Audi**

## Required Parts and Tools

| Required Parts | Part Number |
|---|---|
| Crankcase pressure regulating valve | 06H103495J |
| Front crankshaft seal | 06L103085B |
| Front crankshaft pulley bolt | WHT001760 |

| Required Tool | Tool number |
|---|---|
| Dip stick tool | T40178 |
| VAS Tester | Minimum software level: *Base 19, Brand 19.34* |

## Additional Information

The following Technical Service Bulletin will be necessary to complete this procedure:

- TSB 2011732 *00 Software Version Management (SVM), operating instructions.*

All parts and service references provided in this TSB (2027731) are subject to change and/or removal. Always check with your Parts Department and service manuals for the latest information.

© 2013 Audi of America, Inc.
All rights reserved. Information contained in this document is based on the latest information available at the time of printing and is subject to the copyright and other intellectual property rights of Audi of America, Inc., its affiliated companies and its licensors. All rights are reserved to make changes at any time without notice. No part of this document may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, nor may these materials be modified or reposted to other sites, without the prior express written permission of the publisher.

# Exhibit 2

# Technical Service Bulletin



**10 Engine replacement, checking for debris lodged in transferred assemblies**

10 13 10 2018288/4 September 5, 2013. Supersedes Technical Service Bulletin Group 10 number 10-02 dated September 14, 2010 for reasons listed below.

| Model(s) | Year | VIN Range | Vehicle-Specific Equipment |
|----------|------|-----------|----------------------------|
| All | 1998 - 2014 | All | Not Applicable |

## Condition

| REVISION HISTORY | | |
|---|---|---|
| **Revision** | **Date** | **Purpose** |
| 4 | - | Revised header data (Added model years) |
| 3 | 9/14/2010 | Revised header data (Added models and MYs)<br>Revised *Technical Background* and *Service* (Added supercharger) |
| 2 | 11/20/2008 | Revised title to include Repair Group |

Prior to engine replacement, any debris lodged in transferred assemblies must be removed.

## Technical Background

If the vehicle's engine experienced a serious mechanical problem, it is possible that small pieces of metal debris resulting from the mechanical problem may have become deposited in the intake manifold, air intake hoses, exhaust manifolds, exhaust down-pipes, turbocharger, supercharger, and/or intercooler.

 **Note:**

If these pieces are not removed prior to the installation and operation of the replacement engine, the pieces may be drawn into the combustion chamber, which can cause a knocking noise and subsequent serious engine damage.

## Production Solution

Not applicable.

© 2013 Audi of America, Inc.
All rights reserved. Information contained in this document is based on the latest information available at the time of printing and is subject to the copyright and other intellectual property rights of Audi of America, Inc., its affiliated companies and its licensors. All rights are reserved to make changes at any time without notice. No part of this document may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, nor may these materials be modified or reposted to other sites, without the prior expressed written permission of the publisher.

# Technical Service Bulletin



## Service

Prior to installation of replacement engines, thoroughly inspect and clean the intake manifold, air intake hoses, exhaust manifold, exhaust downpipes, turbocharger, supercharger, and intercooler. This inspection is especially important on engines with two stage or variable intake manifolds, which must be checked internally for any signs of debris.

- If any debris is evident in the intake manifold or cylinder heads ports, replace the manifold, as cleaning of the internal intake paths cannot be 100% guaranteed. Debris can be lodged in the inner parts of the manifold until the manifold changes intake lengths. The debris may loosen and travel into the replacement engine.

- Not every engine replacement will require a new intake manifold. The decision to replace the intake manifold depends on the extent of mechanical damage.

**Tip:** Engine damage caused by failure to clean debris from assemblies that are transferred to a replacement engine is not covered by Warranty.

## Warranty

This TSB is informational only and not applicable to any Audi warranty.

## Additional Information

All parts and service references provided in this TSB (2018288) are subject to change and/or removal. Always check with your Parts Department and service manuals for the latest information.

© 2013 Audi of America, Inc.
All rights reserved. Information contained in this document is based on the latest information available at the time of printing and is subject to the copyright and other intellectual property rights of Audi of America, Inc., its affiliated companies and its licensors. All rights are reserved to make changes at any time without notice. No part of this document may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, nor may these materials be modified or reposted to other sites, without the prior expressed written permission of the publisher.

# Civil Case Information Statement

## Case Details: MERCER | Civil Part Docket# L-001632-21

**Case Caption:** GONZALEZ HERNAN  VS VOLKSWAGEN
GROUP OF  AMERICA

**Case Initiation Date:** 08/05/2021

**Attorney Name:** AMEY JIYOUNG PARK

**Firm Name:** BERGER MONTAGUE, PC

**Address:** 1818 MARKET ST
PHILADELPHIA PA 19103

**Phone:** 2158753000

**Name of Party:** PLAINTIFF : GONZALEZ, HERNAN, A

**Name of Defendant's Primary Insurance Company**
(if known): None

**Case Type:** TORT-OTHER

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** YES

**If yes, list docket numbers:** 1:21-cv-10546-NLH-MJS

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** YES

**Are sexual abuse claims alleged by: HERNAN A GONZALEZ?** NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**


**Do you or your client need any disability accommodations?** NO
    **If yes, please identify the requested accommodation:**


**Will an interpreter be needed?** NO
    **If yes, for what language:**


**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** YES


I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

08/05/2021
Dated

/s/ AMEY JIYOUNG PARK
Signed